**In re SPRINGFIELD FURNITURE, INC. t/a Cost Less Furniture, Inc., Debtor.**

**Robert L. MOORE, Plaintiff/Counter–Defendant,**

**v.**

**Joseph F. MANSON, III, Trustee, Defendant/Counter–Plaintiff.**

Bankruptcy No. 85–00349–A.
Adv. No. 88–0156–AB.

United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

Sept. 30, 1992.

H. Jason Gold, Gold & Stanley, P.C., Alexandria, Va., for Joseph F. Manson, III, trustee.

## MEMORANDUM OPINION

MARTIN V.B. BOSTETTER, Jr., Chief Judge.

We are called upon to determine whether the assets of a retirement plan created by a debtor corporation for the benefit of the debtor's employees are assets of the debtor's bankruptcy estate, and if such assets are not assets of the bankruptcy estate, whether certain transfers of assets made by the debtor to the retirement plan can be avoided by the Chapter 7 trustee. For the reasons set forth herein we hold that (1) the assets of the retirement plan are not assets of the debtor's bankruptcy estate except to the extent they exceed the liabilities of the plan after the plan is liquidated, and (2) the last two contributions made to the plan may be avoided by the trustee.

Springfield Furniture, Inc. (the "Debtor") created a defined benefit pension plan entitled the Springfield Furniture, Inc. Defined Benefit Pension Plan (the "Plan"). The creation of the Plan was effectuated by the execution on May 26, 1982 of two documents, the Springfield Furniture, Inc. Defined Benefit Pension Plan (the "Plan Agreement") and the Springfield Furniture, Inc. Defined Benefit Pension Plan Trust Agreement (the "Trust Agreement").

The Plan Agreement contains provisions concerning the eligibility of and benefits payable to the employees of the Debtor, who are the beneficiaries of the Plan. The Plan Agreement also provides that the Board of Directors of the Debtor may amend[1]

John D. Sawyer, Hudock, Sawyer & Azarcon, Vienna, Va., for Robert L. Moore.

---

1. Section 10.1 of the Plan Agreement, which pertains to Plan amendments, provides as follows:

10.1 *Amendments*

The Employer reserves the right to amend the Plan by action of its Board [of Directors] at any time and times without the consent or approval of any participant, beneficiary, or other person and for any purpose or purposes the Board may determine in its sole discretion to be necessary or advisable, including (among others) changes designated to maintain its status as a qualified plan under the Code or to facilitate its adminis-

tration. However, no such amendments shall (i) cause any part of the Trust to be used for, or diverted to, any purpose other than the exclusive benefit of participants or their beneficiaries; (ii) prior to the satisfaction of all liabilities to participants and their beneficiaries, permit the Employer to recoup or obtain any funds then or thereafter held by the Trust; or (iii) reduce the accrued benefit to which any participant is then entitled, unless such reduction is required in order for the Plan or the Trust to qualify under or to meet the then requirements of (a) Section 401 of the Code, as amended, or

or terminate [2] the Plan at any time. Upon the termination of the Plan and satisfaction of all of its liabilities, the Plan Agreement provides that any remaining assets of the Plan would pass to the Debtor.[3]

Under the provisions of the Trust Agreement, the Debtor created a trust (the "Trust") to hold the assets of the Plan. Federal law requires all assets of an employee benefit plan to be held in trust. 29 U.S.C. § 1103. The Trust Agreement designates Robert L. Moore ("Moore") as the initial trustee of the Trust. The Trust Agreement authorizes the trustee of the Trust to manage and invest the Trust's assets and to apply the same to satisfy all obligations of the Plan. By letter dated February 1, 1983, the IRS determined that the Plan was "qualified" under the Internal Revenue Code. As a "qualified" plan, any contributions to the Plan made by the Debtor generally could be used to reduce taxable income in the year the contributions were made. 26 U.S.C. § 404.

The Debtor's original contribution to the Plan in May of 1982 was $100. The Debtor made additional contributions to the Plan prior to March 18, 1985 in the amount of $193,000, as is illustrated in the chart below.

| Date of Contribution | Amount of Contribution |
| --- | --- |
| August 17, 1982 | $6,000 |
| August 17, 1982 | 29,000 |
| August 18, 1982 | 35,000 |
| August 8, 1983 | 30,000 |
| September 8, 1983 | 20,000 |
| September 19, 1983 | 3,000 |
| February 5, 1985 | 70,000 |
| TOTAL | $193,000 |

On March 18, 1985 the Debtor filed a petition for relief under Chapter 11 of the United States Bankruptcy Code (the "Code"). The Debtor continued to operate its business as a debtor-in-possession.[4] On April 4, 1985, without the approval of this Court, the Debtor made a contribution of $10,284.38 to the Plan.

On October 18, 1985, the Debtor converted this case to a case under Chapter 7. A meeting of the Debtor's creditors was held pursuant to § 341 of the Code on December 5, 1985. At such meeting, Joseph F. Manson, III was elected as the Debtor's Chapter 7 trustee (the "Bankruptcy Trustee").

During the creditors meeting, the Bankruptcy Trustee learned of the Plan's existence. Shortly thereafter, the Bankruptcy Trustee insisted that Moore, who is both the president of the Debtor as well as the trustee of the Trust, turn over all of the Plan's assets. On the advice of his coun-

---

(b) any other applicable federal law, or (c) any applicable law of any state, or (d) any applicable ruling or regulation under any such law.

**2.** Section 10.3 of the Plan Agreement, which pertains to Plan termination, provides in part as follows:

10.3 *Termination*
 (a) The Employer reserves the exclusive right to permanently discontinue contributions to the Plan or to terminate the Plan in its entirety by action of its Board at any time the Board may determine in its sole discretion. Termination of the Plan shall be and become effective on or as of the date voted by the Board. From and after such termination, no further benefits shall accrue under the Plan. Upon termination or partial termination of the Plan, the rights of all participants to benefits accrued to the date of such termination or partial termination, to the extent funded as of such date, shall be fully vested. . . .
 . . . .

(d) In no event shall the Employer receive any amounts from the Trust upon termination of the Plan, except that, and notwithstanding any other provision of the Plan, the Employer shall receive such amounts, if any, as may remain after the satisfaction of all liabilities of the Plan and arising out of any variations between actual requirements of the Plan and the assumed actuarial requirements. Notwithstanding anything contained herein to the contrary, the Trustee's fees and expenses of administration of the Trust Fund and other expenses incident to the operation and management of the Plan incurred after the effective date of termination shall be paid from the Trust Fund.

**3.** *See* Section 10.3(d) of the Plan Agreement *supra* note 2.

**4.** The Bankruptcy Code generally bestows on a debtor-in-possession all the rights, powers and duties of a bankruptcy trustee. 11 U.S.C. § 1107(a).

sel, Moore agreed to comply with the Bankruptcy Trustee's demand. On January 28, 1986, Moore turned over to the Bankruptcy Trustee three certificates of deposit with an aggregate value of $235,014.25.[5] These certificates of deposit represented the bulk of the Plan's assets. By a check in the amount of $10,741.73, dated February 7, 1986 and made payable to "Joseph F. Manson, III—Trustee", Moore turned over the remaining assets of the Plan to the Bankruptcy Trustee.

Notwithstanding the Debtor's bankruptcy proceeding and Moore's turnover of the Plan's assets, Moore, as president of the Debtor, executed an amendment to and restatement of the Springfield Furniture, Inc. Defined Benefit Plan (the "Amended Plan Agreement") on August 12, 1986. Moore executed the Amended Plan Agreement allegedly to comply with the provisions of the Tax Equity and Fiscal Responsibility Act of 1982. By letter dated February 12, 1987, the IRS determined that the Plan, as amended by the Amended Plan Agreement, was "qualified" under the Internal Revenue Code.

On March 10, 1988, Moore[6] filed a complaint requesting this court to enter a judgment declaring that the Plan's assets which Moore turned over to the Bankruptcy Trustee continue to be assets of the Plan, and further directing the Bankruptcy Trustee to turn over such assets to Moore. Moore also seeks to hold the Bankruptcy Trustee personally liable for damages al-

legedly incurred by the Plan as a consequence of the Bankruptcy Trustee's mismanagement. The complaint was amended on August 30, 1988 (the "Complaint"). The Bankruptcy Trustee timely filed an answer to the Complaint on September 8, 1988.

The Bankruptcy Trustee filed a Counterclaim in this proceeding on July 25, 1989.[7] In the Counterclaim the Bankruptcy Trustee seeks to avoid all of the Debtor's transfers to the Plan. Through the Counterclaim the Bankruptcy Trustee also seeks to (1) have the Trust declared null and void, (2) hold Moore liable for all debts of the Debtor, and (3) use the Trust's assets to satisfy the obligations of Moore and the Debtor pursuant to section 55–19 of the Code of Virginia.

Before addressing the propriety of the arguments set forth by the parties, this Court finds it necessary to determine whether the Plan is governed by the provisions of the Plan Agreement or the Amended Plan Agreement. The Plan Agreement specifically provides that the Debtor may amend the Plan Agreement at any time by action of its board of directors. The Debtor, through Moore, attempted to amend the Plan Agreement by executing the Amended Plan Agreement on August 12, 1986. However, the execution of the Amended Plan Agreement occurred after the Debtor converted its bankruptcy case to Chapter 7. The Bankruptcy Trustee did not participate

---

5. The certificates of deposit were issued by Sovran Bank, N.A. in the name "Springfield Furniture, Inc. Defined Benefit Pension Plan." Prior to the Bankruptcy Trustee's receipt of the certificates of deposit, the Bankruptcy Trustee notified Sovran Bank that he was "the duly appointed, qualified and acting trustee" of Debtor's bankruptcy estate, and requested that he be replaced for Moore on the Plan's accounts. Evidently Sovran Bank complied with the Bankruptcy Trustee's request.

6. The capacity in which Moore brought this action is not entirely clear from the face of Moore's complaint. In such complaint Moore identifies himself as (1) a former employee of the Debtor, (2) a participant with substantial vested benefits in the Plan, and (3) the trustee of the Trust. This ambiguity does not affect our decision.

7. Prior to filing the Counterclaim, the Bankruptcy Trustee filed a Motion for Leave to File Counterclaim in this proceeding. At a hearing held July 5, 1989, such motion was granted, and an appropriate order was entered on August 22, 1989. Such order was appealed by Moore to the United States District Court for the Eastern District of Virginia. In an order dated March 2, 1990, the District Court held that as the record was incomplete, and as the parties disputed a number of facts which may be material to the question of whether the Counterclaim should be barred, such appeal was premature and inappropriate. However, the District Court noted that the ruling of this Court on whether the Counterclaim is barred by the statute of limitations may be appealed upon entry of the final order disposing of the subject matter in this adversary proceeding.

in the execution of the Amended Plan Agreement.

The United States Supreme Court in *Commodity Futures Trading Commission v. Weintraub*, 471 U.S. 343, 352, 105 S.Ct. 1986, 1992, 85 L.Ed.2d 372 (1985), held that a bankruptcy trustee exercises functions analogous to those possessed by officers and directors outside of bankruptcy. Conversely, the Supreme Court held that the powers of a corporation's directors after such corporation files for bankruptcy "are severely limited. Their role is to turn over the corporation's property to the trustee and to provide certain information to the trustee and to the creditors. §§ 541, 343. Congress contemplated that when a trustee is appointed, he assumes control of the business, and the debtor's directors are 'completely ousted.'" *Weintraub*, 471 U.S. at 352–53, 105 S.Ct. at 1993. Based on this decision, we hold that the attempt of Moore to amend the Plan Agreement without the consent and approval of the Bankruptcy Trustee is a complete nullity.[8]

■ Having determined that the provisions of the Plan Agreement govern the Plan, we next address the issue of whether the Plan's assets are assets of the Debtor's bankruptcy estate. But for a few exceptions not relevant here, § 541(a)(1) of the Code provides that a debtor's bankruptcy estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." As previously noted, the Plan's assets are held by the Trust. Although the Debtor created and funded the Plan and the Trust, the Trust is a separate and distinct legal entity. *Washington–Baltimore Newspaper Guild, Local 35 v. Washington Star Co.*, 543 F.Supp. 906, 910 (D.D.C.1982) ("a pension fund is an independent entity, separate from the employer"); *Holloway v. HECI Exploration Co. Employees' Profit Sharing Plan*, 76 B.R. 563, 568 (N.D.Tex.1987) ("the Plan, a separate legal entity"), *aff'd*, 862 F.2d 513 (5th Cir.1988). The Trust is not owned by the Debtor. Rather, its beneficiaries are the eligible employees of the Debtor. Accordingly, we hold that the assets of the Trust (and Plan) are not assets of the Debtor's bankruptcy estate pursuant to § 541(a)(1). *Holloway*, 76 B.R. at 569.

■ The Bankruptcy Trustee argues that the Plan's assets are property of the Debtor's bankruptcy estate pursuant to § 541(a)(7) of the Code. That section provides that a bankruptcy estate includes "[a]ny interest in property that the estate acquires after the commencement of the case." 11 U.S.C. § 541(a)(7). The Bankruptcy Trustee contends that because he received the Plan's assets from Moore after the commencement of the case, these assets must now be assets of the Debtor's bankruptcy estate.

The Court of Appeals for the Eleventh Circuit rejected such an argument in *Gallucci v. Grant (In re Gallucci)*, 931 F.2d 738 (11th Cir.1991). The factual situation in *Gallucci* is analogous to the controversy currently before this Court. In order to avoid a turnover action, a third party quitclaimed certain assets to a bankruptcy trustee. All parties conceded that at the commencement of the bankruptcy case the debtor did not have an interest in the property conveyed. As the trustee had no right to such property, the court held the convey-

---

**8.** We realize that our holding contradicts the IRS's favorable determination letter of February 12, 1987, and may jeopardize the Plan's status as a qualified plan under the Internal Revenue Code. However, it appears that the authorization to make the request for a favorable determination letter was improper. We note that the Debtor's Application for Determination for Defined Benefit Plan (Form 5300), which requested IRS approval of the Plan amendment, was signed by the Debtor's actuary consultant, Paul H. Abbott, Jr. However, the Power of Attorney and Declaration of Representative (Form 2848) which purported to appoint Abbott as agent and attorney-in-fact for the Debtor (and thereby authorize him to file the Form 5300) was signed by Moore. The Power of Attorney form requires the corporate officer or fiduciary signing the document to certify that he or she has the authority to execute the document on behalf of the taxpayer. As the Power of Attorney was dated August 14, 1986, more than nine months after the Debtor's bankruptcy case was converted to Chapter 7, Moore did not have authority to execute such form on behalf of the Debtor. Therefore, Abbott was unauthorized to file the Debtor's Application for Determination for Defined Benefit Plan.

ance to be akin to a "gift" to the bankruptcy trustee. The *Gallucci* court acknowledged that the broad language of § 541(a)(7) allows a bankruptcy trustee to enter into a contract on behalf of an estate, and that the rights arising from such contract are property of a bankruptcy estate. However, the court explicitly held that § 541(a)(7) should not be interpreted so as to include in a bankruptcy estate transfers "of property having no connection to the debtor and not contracted for by the estate—in effect, conveyances coerced by the trustee." *Id.* at 743. Applying this analysis, we hold that Moore's conveyance of the Plan's assets to the Bankruptcy Trustee does not make those assets property of the Debtor's bankruptcy estate.[9]

■ The Bankruptcy Trustee further argues that the Plan's assets are assets of the Debtor's bankruptcy estate pursuant to § 541(a)(3) of the Code. The Bankruptcy Trustee notes that § 542 of the Code requires an entity holding property that a trustee may use, sell or lease under 11 U.S.C. § 363 to deliver such property to the trustee. The Bankruptcy Trustee reasons that Moore turned over the Plan's assets to the Bankruptcy Trustee in order to comply with the provisions of § 542. Section 550 of the Code authorizes a trustee to recover property that was the subject of an avoided transfer. Asserting that Moore's voluntary turnover of the Plan's assets obviated the need for an avoidance action, the Bankruptcy Trustee argues that such property must therefore constitute property recovered pursuant to § 550 of the Code. Section 541(a)(3) provides that an estate includes "[a]ny interest in property that the trustee recovers under section ... 550[.]" Therefore, the Bankruptcy Trustee concludes that the Plan's assets must be property of the Debtor's bankruptcy estate.

This Court must reject the Bankruptcy Trustee's analysis. In attempting to reach the conclusion that the Plan's assets are property of the estate, the Bankruptcy Trustee contends that Moore turned over the Plan's assets because he was required to do so by § 542. However, we cannot find that Moore was required to turn over the Plan's assets pursuant to § 542 unless it can be shown that the Plan's assets are property of the estate. In reaching this conclusion we note that § 542 only requires the delivery to a trustee of "property that the trustee may use, sell or lease under section 363". Section 363 provides that a trustee may use, sell or lease any "property of the estate." 11 U.S.C. § 363(b), (c). Therefore, § 542 mandates only the turnover of "property of the estate" to a bankruptcy trustee.

Furthermore, an essential element for a recovery pursuant to § 550 is that the property must have been the subject of an avoided transfer. However, the Bankruptcy Trustee never avoided any of the transfers made by the Debtor to the Plan. Therefore, the assets of the Plan cannot be deemed to have been recovered pursuant to § 550, and are not property of the Debtor's bankruptcy estate pursuant to § 541(a)(3).

Having determined the Plan (and all of its assets) is not property of the Debtor's bankruptcy estate, we now address the issues raised in the Counterclaim. In the Counterclaim, the Bankruptcy Trustee asserts that all of the Debtor's transfers to the Plan are voidable as fraudulent prepetition or unauthorized postpetition transfers pursuant to §§ 544, 548 and 549 of the Code. Moore responds that not all of the elements necessary to avoid the transfers are present. Furthermore, Moore asserts that the relief requested is time-barred pursuant to §§ 546(a) and 549(d) of the Code.

---

**9.** Even if this Court agreed with the Bankruptcy Trustee's broad interpretation of § 541(a)(7), it is still uncertain if the Plan's certificates of deposit would be included in the Debtor's bankruptcy estate. For a document to be a "certificate of deposit" under section 8.3–104 of the Code of Virginia, such instrument must be "payable to order or to bearer." There is no evidence before this Court indicating that the certificates of deposit were payable to the bearer. Furthermore, there is no evidence before this Court indicating that the certificates of deposit were properly indorsed to the order of the Bankruptcy Trustee. If the certificates of deposit were "payable to order" and not indorsed by Moore, then the Bankruptcy Trustee could not be a proper holder of the certificates. Va. Code Ann. § 8.3–202 (Michie 1991).

We will address the timeliness of the Counterclaim first.

■ Sections 548 and 544 of the Code give the trustee the power to avoid certain prepetition transfers. However, Section 546(a) of the Code limits the ability of a trustee to enforce such avoidance powers. This section provides in pertinent part as follows:

(a) An action or proceeding under section 544 [or] 548 ... of this title may not be commenced after the earlier of—

(1) two years after the appointment of a trustee under section 702 ... of this title; or

(2) the time the case is closed or dismissed.

11 U.S.C. § 546(a). As this case has not been closed or dismissed, we must determine when the Bankruptcy Trustee was appointed.

Section 702(b) of the Code provides that "[a]t the meeting of creditors held under section 341 of this title, creditors may elect one person to serve as trustee in the case...." 11 U.S.C. § 702(b). On December 5, 1985, at the Debtor's section 341 meeting, Joseph F. Manson was elected trustee of this case in accordance with § 702. A court is not required to take any action after the undisputed election of a Chapter 7 trustee for the election to be effective. *Chapman v. Cardell Cabinets, Inc. (In re Nash Phillips/Copus–Houston, Inc.)* 114 B.R. 466, 473 (Bankr.W.D.Tex. 1990). Therefore, the two year statute of limitations imposed by § 546(a) began to run on December 5, 1985.

■ An order appointing Joseph F. Manson trustee was not entered by this Court until July 12, 1989. The Bankruptcy Trustee argues that the two year period provided for in § 546(a) should commence on that date, citing as authority *O'Donnell v. Washington Post (In re Bob Grissett Golf Shoppes, Inc.)*, 58 B.R. 996 (E.D.Va.

1986). In *Bob Grissett*, the court held that the § 546 limitations "period begins to run when the U.S. Trustee's appointment of a trustee in a bankruptcy case is approved by the Bankruptcy Judge." *Id.* at 998. However, *Bob Grissett* involved the appointment of a Chapter 11 trustee in a United States trustee pilot district, not the appointment of a Chapter 7 trustee. Section 151104 of the Code, which governed the appointment of Chapter 11 trustees in pilot districts,[10] differs significantly from § 702. Unlike § 702, § 151104 provided that a Chapter 11 trustee could be appointed pursuant to court order only after notice and a hearing. Therefore, the holding of *Bob Grissett* is clearly distinguishable from this proceeding.

■ We note that this Court's order of July 12, 1989 specifically provided that Manson's appointment was effective, *nunc pro tunc*, on December 5, 1985. "*Nunc pro tunc*" is a latin phrase literally meaning "now for then," and a judgment entered *nunc pro tunc* is one given effect as of a past date. *Weil v. Markowitz*, 829 F.2d 166, 174 & n. 18 (D.C.Cir.1987), *cert. denied*, —— U.S. ——, 111 S.Ct. 68, 112 L.Ed.2d 42 (1990). Therefore, even if this Court's order was necessary to effectuate Manson's appointment as trustee, the two year limitations period of § 546(a) would commence on December 5, 1985, which is the order's effective date. *MortgageAmerica Corp. ex rel. Knostman v. Am. Fed. Sav. & Loan Corp. (In re MortgageAmerica Corp.)*, 831 F.2d 97, 99 (5th Cir.1987).

Section 549(a) of the Code authorizes a trustee to avoid certain postpetition transfers. However, § 549(d) of the Code limits the ability of a trustee to enforce such avoidance power. Such subsection provides as follows:

(d) An action or proceeding under this section may not be commenced after the earlier of—

---

**10.** Chapter 15 of Title 11 (including section 151104), originally enacted as part of the Code in 1978, contained provisions concerning United States trustees. These provisions applied only in cases pending in certain "pilot districts," including this district. The United States Trustees program proved very successful, and in 1986 the Code was amended in order to have the system instituted nationwide. With its provisions thus incorporated into the other chapters of Title 11, Chapter 15 was repealed.

(1) two years after the date of the transfer sought to be avoided; or

(2) the time the case is closed or dismissed.

11 U.S.C. § 549(d).

The Debtor's contribution of $10,284.38 to the Plan on April 4, 1985 is the only postpetition transfer that the Bankruptcy Trustee seeks to avoid. Therefore, Section 549(d) requires an action instituted to avoid such transfer to be commenced no later than April 4, 1987.

■ As previously mentioned, the Bankruptcy Trustee's Counterclaim was filed on July 25, 1989. Because this was more than two years after the Bankruptcy Trustee was appointed and the postpetition transfer was made, it would appear that the Bankruptcy Trustee's avoidance actions should be barred by the statute of limitations provided for in §§ 546(a) and 549(d) of the Code. However, the Bankruptcy Trustee contends that Moore should be equitably estopped from asserting the statute of limitations defense. "Equitable estoppel applies where, despite the plaintiff's knowledge of the facts, the defendant engages in intentional misconduct to cause the plaintiff to miss the filing deadline." *English v. Pabst Brewing Co.*, 828 F.2d 1047, 1049 (4th Cir.1987), *cert. denied*, 486 U.S. 1044, 108 S.Ct. 2037, 100 L.Ed.2d 621 (1988) (citations omitted). In order for equitable estoppel to apply, the Bankruptcy Trustee must prove that he "actually and reasonably" relied on the alleged misconduct in foregoing the avoidance actions. *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128–29 (4th Cir.1987).

The Court of Appeals for the Eighth Circuit has held that a defendant to an avoidance action can be equitably estopped from using the statute of limitations as a defense. *Smith v. Mark Twain Nat'l Bank*, 805 F.2d 278 (8th Cir.1986). In *Smith*, the bankruptcy trustee attempted to utilize § 549(a) to avoid a postpetition transfer made by the debtor to a bank. Because the avoidance action was brought more than two years after the transfer, the bank argued that the statute of limitations provided for in § 549(d) barred such action.

However, in a letter from the bank to the trustee dated only a few months after the transfer, the bank in effect had promised the trustee that it would turn over the funds in dispute. A bank officer also admitted in a deposition that the money was properly owing to the trustee. The court held that the trustee relied on the bank's representation by not instituting a timely avoidance action. *Id.* at 294. The court stated that

[t]o allow Bank to keep the proceeds of the certificate in light of the fact that Bank promised its return and admits that the certificate is owing to Trustee, would be both inequitable and unjust. ... [W]e believe that these facts make out a clear case for application of the doctrine of equitable estoppel, in order to prevent Bank from obtaining a benefit to which Trustee clearly has the superior right.

*Id.* at 293.

■ In order to determine if Moore should be estopped from asserting the statute of limitations defense, we must decide if Moore engaged in intentional misconduct to cause the Bankruptcy Trustee to miss the filing deadline. The record reveals and we must find that Moore voluntarily delivered the certificates of deposit to the Bankruptcy Trustee. Although at trial Moore asserted that such turnover was for inspection purposes only, *Tr.* at 129–30, Moore could have easily delivered a photocopy of the certificates to the Bankruptcy Trustee. Furthermore, if Moore had intended the Bankruptcy Trustee to merely inspect the assets of the Plan, we believe that Moore would not have written a check payable to "Joseph F. Manson, III—Trustee" for $10,-741.73.

It appears that after turning over the Plan's assets, Moore did not formally request the Bankruptcy Trustee to return such assets until he filed his initial complaint in this proceeding. We note that such complaint was not filed until after the expiration of the limitations period provided for in §§ 546(a) and 549(d).

We find that by voluntarily turning over the Plan's assets to the Bankruptcy Trustee and failing to make a formal request for

the return of such assets until after the limitations period for avoidance actions had expired, Moore engaged in intentional misconduct to cause the Bankruptcy Trustee to allow the statute of limitations period to expire. With all of the Plan's assets in his possession, we believe that the Bankruptcy Trustee reasonably relied on Moore's actions when he failed to timely institute an avoidance action.

Moore argues that the statute of limitations cannot be tolled because the Bankruptcy Trustee has not alleged or proved any active, deliberate or consistent concealment of facts by either party. Moore is confusing the doctrine of equitable estoppel with the doctrine of equitable tolling. These two doctrines were distinguished by the Fourth Circuit in *English v. Pabst Brewing Co.*, 828 F.2d 1047 (4th Cir.1987), *cert. denied*, 486 U.S. 1044, 108 S.Ct. 2037, 100 L.Ed.2d 621 (1988). In *English*, the court stated that "[e]quitable tolling applies where the defendant has wrongfully deceived or misled the plaintiff in order to conceal the existence of a cause of action." *Id.* at 1049. Thus, for equitable tolling to apply, the existence of a cause of action must be concealed from the plaintiff. Equitable estoppel, on the other hand, applies where the defendant engages in intentional misconduct to cause the plaintiff to miss the filing deadline, notwithstanding the plaintiff's knowledge of the facts. *Id.* Whereas a plaintiff must prove concealment for an equitable tolling, equitable estoppel will apply even where the plaintiff has actual knowledge of the applicable facts.

Moore also asserts that the Counterclaim should be barred by laches. The equitable doctrine of laches precludes the prosecution of stale causes of action if the party bringing the action lacks diligence in pursuing his or her claim and the party asserting the defense has been prejudiced by that lack of diligence. *Newport News Shipbldg. and Dry Dock Co. v. Parker*, 935 F.2d 20, 27 (4th Cir.1991) (citing *Costello v. United States*, 365 U.S. 265, 282, 81 S.Ct. 534, 543, 5 L.Ed.2d 551 (1961)). We find that the Bankruptcy Trustee did not lack diligence by delaying the institution of the avoidance action, considering the Bankruptcy Trustee had possession of all of the Plan's assets and Moore made no formal demand for the return of those assets prior to filing his initial complaint. Furthermore, we find that Moore was not prejudiced by the Bankruptcy Trustee's delay in instituting the avoidance action.

Turning now to the substance of the Counterclaim, the Bankruptcy Trustee asserts four separate grounds for avoiding the Debtor's prepetition transfers to the Plan: (1) the transfers were voluntary and without valuable consideration and are therefore voidable under Virginia law as incorporated by § 544(b) of the Code; (2) the transfers were made with an intent to hinder, delay or defraud creditors and are therefore voidable under Virginia law as incorporated by § 544(b); (3) the transfers were made with an intent to hinder, delay, or defraud creditors and are therefore voidable under § 548; and (4) the transfers were made in exchange for less than a reasonably equivalent value while the Debtor was insolvent and are therefore voidable under § 548.

Section 544(b) of the Code authorizes a trustee to utilize certain powers possessed by an actual, unsecured creditor under state law. Such section provides as follows:

> (b) The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b). Therefore, if the Bankruptcy Trustee can prove that there is an existing unsecured creditor that could avoid the transfers to the Plan pursuant to state law, then the Bankruptcy Trustee can likewise avoid those transfers.

During the trial the Bankruptcy Trustee alleged that Moore was an unsecured creditor of the Debtor at the time that each of the transfers to the Plan was

made. In support of such allegation is evidence indicating that as of December 15, 1981, prior to the creation of the Plan, the Debtor was indebted to Moore in the amount of $139,025.00 for authorized but unpaid salary accrued between 1972 and 1981. *Exh.* BBB. The minutes of the December 15, 1981 meeting of the board of directors of the Debtor provide that "[f]or the record it is emphasized that [Moore's] unpaid authorized salary is still owed.... Whenever the Company is financially able these back salaries should be paid." *Exh.* BBB. Nothing in the record or pleadings indicate that this liability was ever abandoned by Moore or satisfied by the Debtor. Based on this evidence, we conclude that Moore was an unsecured creditor of the Debtor when all of the transfers to the Plan were made, and therefore, pursuant to § 544(b), the Bankruptcy Trustee possesses all rights and powers that Moore had under state law to avoid the transfers to the Plan.

■ Section 55–81 of the Code of Virginia provides in part that a transfer "which is not upon consideration deemed valuable in law ... shall be void as to creditors whose debts shall have been contracted at the time it was made...." Va.Code Ann. § 55–81 (Michie Supp.1991).[11] The phrase "consideration deemed valuable in law" refers to *any* valuable consideration received by the transferor. *C–T of Va., Inc. v. Euroshoe Assocs.*, 762 F.Supp. 675, 678 (W.D.Va.1991), *aff'd.*, 953 F.2d 637 (4th Cir. 1992); *Inspiration Coal, Inc. v. Mullins*, 690 F.Supp. 1502, 1505–06 (W.D.Va.1988).

■ The Plan provides for the payment of retirement and disability benefits to certain employees of the Debtor. To be eligible for such benefits, employees must have been employed by the Debtor for an established period of time. The value of these benefits is based primarily on two factors: the employee's salary and length of service. Generally, as an employee's length of service increases, his or her benefits also increase.

It appears that the Plan served as an inducement in the hiring and continued employment of the Debtor's employees. The retirement benefits payable under the Plan are essentially a form of deferred compensation. The benefits payable to the Debtor's employees pursuant to the Plan were just one part of an employee's compensation package. The Debtor made the business decision to make contributions to the Plan in lieu of increasing employees' salaries.

In exchange for its contributions to the Plan, the Debtor received "consideration deemed valuable at law" from its employees. The employees performed services on behalf of the Debtor in exchange for their compensation package, which included the benefits payable under the Plan. The sliding scale of Plan benefits payable also provided an incentive to the Debtor's employees to refrain from pursuing other employment opportunities. Since the Debtor received "consideration deemed valuable at law" in exchange for its transfers to the Plan, such transfers cannot be voided pursuant to section 55–81 of the Code of Virginia.

■ We next examine whether the Debtor's transfers to the Plan can be avoided by the Bankruptcy Trustee pursuant to section 55–80 of the Code of Virginia, which provides that transfers made "with intent to delay, hinder or defraud creditors" are void. When fraud is relied upon to set aside a conveyance pursuant to section 55–80, it must be proven by evidence that is "clear, cogent and convincing." *Colonial Inv. Co. v. Cherrydale Cement Block Co.*, 194 Va. 454, 459, 73 S.E.2d 419, 422 (1952). Where the facts and circumstances indicate that the transaction was made in bad faith, fraud may be inferred. *Temple v. Jones, Son & Co.*, 179 Va. 286, 297, 19 S.E.2d 57, 60 (1942).

■ A prima facie case of fraud shifts the burden of proof, making it in-

---

11. A 1988 amendment to section 55–81 provides that a transfer will not be held void under this section unless the transferor was insolvent or was rendered insolvent as a consequence of the transfer. Because of our decision below, we need not address whether the amendment applies to this proceeding.

cumbent upon the defendant to prove that the transaction was made in good faith. *Temple*, 179 Va. at 298, 19 S.E.2d at 61. A prima facie case for fraud can be established by proving "badges of fraud." *Id.* Even a single badge of fraud may be sufficient to establish a prima facie case of fraud. *Hickman's Ex'r v. Trout*, 83 Va. 478, 491, 3 S.E. 131 (1887). A transferor's retention of an interest in property that is the subject of an alleged fraudulent transfer has been held to be a badge of fraud. *Hyman v. Porter (In re Porter )*, 37 B.R. 56, 63 (Bankr.E.D.Va.1984). However, the relationship of the parties and the insolvency of the grantor do not alone constitute badges of fraud, although a suspicious transaction between related parties must be "closely scrutinized." *Lipman v. Norman Packing Co.*, 146 Va. 461, 467, 131 S.E. 797, 798 (1926). *See also Temple*, 179 Va. at 297, 19 S.E.2d at 61. Furthermore, where an alleged fraudulent transfer is between related parties, "only slight evidence is required to shift the burden of showing [the] *bona fides* " of the transaction. *Lipman*, 146 Va. at 467–68, 131 S.E. at 798.

■ As previously noted, the Plan Agreement provides that, upon the termination of the Plan and the satisfaction of all of its liabilities, any remaining assets of the Plan would pass to the Debtor. Therefore, the Debtor retained an interest in any assets transferred to the Plan. Furthermore, for the purpose of reviewing the propriety of the Debtor's transfers to the Plan, we conclude that the Debtor and the Plan are related parties. We note that the Debtor created the Plan, served as the Plan Administrator, and had the power to terminate the Plan at any time. In addition, Moore served as both president of the Debtor and trustee of the Trust.

We find that the Debtor's retention of an interest in the property transferred to the Plan, a related party, constitutes a badge of fraud sufficient to shift the burden of proof to Moore. The evidence supporting this finding is clear, cogent and convincing. Therefore, Moore must prove that the transfers to the Plan were made in good faith and without an intent to hinder, delay or defraud creditors, or such transfers will be void.

■ The evidence before this Court indicates that the Debtor had an operating profit in 1982 and 1983. The Debtor's unaudited balance sheets indicate that the Debtor had a positive cash balance of more than $15,000 at the end of each of those years. While the certified public accountant employed by the Bankruptcy Trustee testified that in his opinion the Debtor could not pay its bills, *Tr.* at 286, the Debtor's 1983 balance sheet indicates that the Debtor's cash and accounts receivable ($49,155.18 total) exceeded its outstanding accounts payable, accrued payroll, payroll taxes payable, sales taxes payable and federal and state income taxes ($23,394.17 total). Even the Debtor's federal income tax returns, which typically understate income where possible so as to reduce federal income tax liability, indicate that the Debtor had taxable income in all of the tax years ending in 1982 and 1983. Despite the prima facie case of fraud, a review of this evidence leads us to believe that the Debtor's transfers to the Plan in 1982 and 1983 were made in good faith and without an intent to hinder, delay, or defraud creditors.

■ However, the Debtor's business took a turn for the worse in 1984. The Debtor's unaudited profit and loss statement indicates that the Debtor had a loss of $54,137.02 (before miscellaneous income) in 1984. The Debtor's unaudited balance sheet for the end of 1984 indicates that the Debtor had a negative cash balance [12] of $67,119.73. The Debtor's current liabilities ($31,877.48) greatly exceeded its cash and accounts receivable ($− 24,661.24). The Debtor reported a loss of $42,724 on its federal income tax return for the fiscal year ending November 30, 1984. The Debtor did not make any contributions to the Plan in 1984.

Because of its mounting losses and problems with cash flow, the Debtor filed for

---

12. The negative cash balance resulted from an overdraft on the debtor's checking account.

bankruptcy in March, 1985. In the month prior to its filing, the Debtor made a $70,000 contribution to the Plan. This contribution was twice as large as any other contribution to the Plan. Five days before such contribution, the Debtor's unaudited balance sheet indicates that the Debtor had a negative cash balance of $69,376.23. In light of this evidence, we conclude that Moore failed to rebut the Bankruptcy Trustee's prima facie case for fraud, and therefore the Debtor's transfer of $70,000 to the Plan on February 5, 1985 (the "$70,000 Transfer") was made with an intent to hinder, delay or defraud creditors.

▆▆ The last sentence of section 55–80 provides that its provisions "shall not affect the title of a purchaser for valuable consideration, unless it appear that he had notice of the fraudulent intent of his immediate grantor or of the fraud rendering void the title of such grantor." Va.Code Ann. § 55–80 (Michie 1986). This provision has led some courts to conclude that a transfer cannot be set aside under section 55–80 unless it is proved that the grantee had knowledge of the grantor's fraudulent intent. *Porter*, 37 B.R. at 64; *Hutcheson v. Sav. Bank of Richmond*, 129 Va. 281, 291, 105 S.E. 677 (1921). Because the Debtor was the Plan Administrator and Moore was both the president of the Debtor and trustee of the Trust, the Plan is deemed to have had knowledge of the Debtor's fraudulent intent when the Debtor made the transfers. As a consequence of the Debtor's fraudulent intent regarding the $70,000 Transfer, as well as the Plan's knowledge of such intent, the $70,000 Transfer is void pursuant to section 55–80.

We now address the Bankruptcy Trustee's argument that the Debtor's transfers to the Plan are voidable under § 548 of the Code. Section 548(a) authorizes a trustee to avoid certain transfers made "on or within one year before the date of the filing of the petition...." The $70,000 Transfer was the only transfer made by the Debtor to the Plan "on or within one year before the date" Debtor filed its Chapter 11 petition. Therefore, the $70,000 Transfer is the only transfer to the Plan that could be avoided pursuant to § 548.

▆▆ Section 548(a)(1) permits the Bankruptcy Trustee to avoid any transfer made "with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted...." 11 U.S.C. § 548(a)(1). The operative language of this section closely parallels the language of section 55–80 of the Code of Virginia. As with section 55–80, courts applying § 548(a)(1) may infer fraudulent intent from the circumstances surrounding an alleged fraudulent transfer, particularly those constituting badges of fraud. *Max Sugarman Funeral Home Inc. v. A.D.B. Investors*, 926 F.2d 1248, 1254 (1st Cir. 1991). Another similarity with section 55–80 is that a trustee must prove all elements under § 548(a)(1) by the clear and convincing evidentiary standard. *Glinka v. Bank of Vt. (In re Kelton Motors, Inc.)*, 130 B.R. 170, 179 (Bankr.D.Vt.1991).

▆▆ We hold that the $70,000 Transfer is voidable pursuant to § 548(a)(1) for reasons identical to those that make it voidable pursuant to section 55–80 of the Code of Virginia. The Debtor's transfer of cash to a related party while retaining an interest in such cash creates a prima facie case of fraud, and the Debtor has failed to present sufficient competent evidence to rebut the presumption of fraud. The evidence supporting these findings is clear and convincing.

▆▆ Section 548(a)(2) provides that if a debtor "received less than a reasonably equivalent value in exchange" for a transfer, such transfer can be avoided provided the debtor (1) was insolvent or became insolvent as a result of the transfer; (2) was undercapitalized; or (3) believed it would incur debts which it would be unable to pay as they came due. "Reasonable equivalence should depend on all the facts of each case[.]" *Cooper v. Ashley Communications, Inc. (In re Morris Communications NC, Inc.)*, 914 F.2d 458, 467 (4th Cir.1990) (quoting *Bundles v. Baker*, 856 F.2d 815, 823–24 (7th Cir.1988)). A trustee need only

prove each of the elements under § 548(a)(2) by a preponderance of the evidence. *Kelton Motors,* 130 B.R. at 179.

■ As previously noted, the Debtor's contributions to the Plan were part of the Debtor's compensation package payable to its employees. In exchange for providing services on behalf of the Debtor, the Debtor's employees became entitled to receive benefits from the Plan as part of their compensation. Therefore, by making contributions to the Plan, the Debtor received in return the services provided by its employees.

There was no probative evidence presented at trial as to the value of the services provided by the Debtor's employees to the Debtor. Without such evidence, it is impossible to determine if the Debtor "received less than a reasonably equivalent value in exchange" for its contributions to the Plan. Therefore, we may not avoid the $70,000 Transfer pursuant to § 548(a)(2) of the Code.

In his Counterclaim the Bankruptcy Trustee also seeks, pursuant to § 549(a) of the Code, to avoid the Debtor's postpetition transfer of $10,284.38 to the Plan made on April 4, 1985 (the "Postpetition Transfer"). Section 549(a) provides as follows:

(a) Except as provided in subsections (b) or (c) of this section, the trustee may avoid a transfer of property of the estate—

(1) made after the commencement of the case; and

(2)(A) that is authorized only under section 303(f) or 542(c) of this title; or

(B) that is not authorized under this title or by the court.

11 U.S.C. § 549(a). The exceptions provided for in subsections (b) and (c) do not apply to the Postpetition Transfer.

The $10,284.38 transferred to the Plan on August 4, 1985 was clearly property of the Debtor's bankruptcy estate under § 541(a) of the Code, was made after the commencement of the case, and was never authorized by this Court. Therefore, unless the Post-petition Transfer was authorized by the Code, it may be avoided pursuant to § 549.

■ We look to § 363(c)(1) of the Code to determine whether the Postpetition Transfer was authorized. Section 363(c)(1) provides that a trustee or debtor-in-possession [13] is authorized to enter into transactions and use property of the estate in the ordinary course of business without notice or a hearing. The Code does not define the phrase "ordinary course of business." However, numerous courts have held that two tests must be satisfied for an action to be held to be in the ordinary course of business: (1) would a creditor expect notice and a hearing on the contemplated transaction because of its unusual nature; and (2) is the contemplated transaction ordinary for the particular type of business concerned. *Chase Manhattan Bank v. Walt Robbins, Inc. (In re Walt Robbins, Inc.),* 129 B.R. 452, 456 (Bankr.E.D.Va.1991); *In re Media Central, Inc.,* 115 B.R. 119, 123–24 (Bankr.E.D.Tenn.1990); *Johnston v. First St. Cos. (In re Waterfront Cos.)* 56 B.R. 31, 34–35 (Bankr.D.Minn.1985). If the Debtor failed to satisfy either test, then the transaction is not in the ordinary course of business.

■ We believe that a creditor would expect to be given notice and an opportunity to object to the Postpetition Transfer. Only seventeen days passed between the Debtor's bankruptcy filing and the Postpetition Transfer. Based on the evidence before the court, it was impossible for the Debtor to have incurred postpetition obligations to the Plan in such a large amount. Therefore, part or all of the $10,284.38 payment was used to either (1) reduce prepetition obligations to the Plan, or (2) increase a surplus in the Plan. The payment of an unsecured creditor's prepetition claim before other creditors is an action which most creditors would expect to be given notice of and an opportunity to object. Likewise, the transfer of estate assets outside of the estate without the receipt of any immediate benefit in return is an action which most creditors would expect notice of and an opportunity to be heard.

**13.** *See supra* note 4.

In addition, it appears that the Debtor treated all Plan contributions as payments outside of the ordinary course of business, as all of the Plan contributions were approved by the Debtor's Board of Directors in the minutes of their meetings. *Exh.* BBB. Based on this factor and our belief that creditors would expect to receive notice of the postpetition contributions, we hold that the Postpetition Transfer was not in the ordinary course of the Debtor's business, and may be avoided pursuant to § 549.

We finally address whether the Debtor's reversionary interest in the Plan is property of the Debtor's bankruptcy estate. As previously noted, the Plan Agreement provides that the Debtor can terminate the Plan at any time. Furthermore, the Plan Agreement provides that after the termination of the Plan, the Debtor "shall receive such amounts, if any, as may remain after the satisfaction of all liabilities of the Plan...." The distribution of residual assets of the Plan to Debtor is permissible under applicable law if

(A) all liabilities of the plan to participants and their beneficiaries have been satisfied,

(B) the distribution does not contravene any provision of law, and

(C) the plan provides for such a distribution in these circumstances.

29 U.S.C. § 1344(d)(1).

As stated above, § 541(a)(1) of the Code provides that but for certain exceptions not applicable to this proceeding, property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." Applying this provision to the facts before us, we must find that the Debtor's reversionary interest in the Plan's assets is an asset of the estate. *Creasy v. Coleman Furniture Corp,* 763 F.2d 656, 662 (4th Cir.1985) ("[t]he trustee acquires the rights that the corporate bankrupt possessed; therefore, the excess funds would be an asset in the bankrupt's estate"). *See also In re Bicoastal Corp.,* 136 B.R. 290, 295 (Bankr.M.D.Fla.1992).

However, the estate's reversionary interest does not give it a present right to part or all of the Plan's assets. As previously noted, federal law provides that residual assets of an employer's pension plan may be distributed to the employer if all of the plan's liabilities to participants and their beneficiaries have been satisfied. 29 U.S.C. § 1344(d)(1)(A). Furthermore, the plan must specifically provide for such a distribution. 29 U.S.C. § 1344(d)(1)(C). In this case, the Plan Agreement provides that Debtor is entitled to the Plan's excess assets only after (1) the Plan is terminated, and (2) all of the Plan's liabilities have been satisfied. Neither of these prerequisites has been satisfied.

First, the procedures that must be followed for the Plan to be terminated are set forth in 29 U.S.C. § 1341. While § 1341 has been amended several times during the pendency of this bankruptcy proceeding, it appears that at no time were all of the requirements for the termination of the Plan satisfied. Only by strictly complying with all of the provisions of § 1341 can the Plan be terminated. *Phillips v. Bebber,* 914 F.2d 31, 34 (4th Cir.1990).

Second, numerous liabilities of the Plan remain unsatisfied, creating an uncertainty as to the exact amount of funds in the Plan (if any) that the Bankruptcy Trustee will be entitled to upon the Plan's termination. The Bankruptcy Trustee will retain those transfers to the Plan that were voided as a consequence of this decision. Also, the Plan administrator must "purchase irrevocable commitments from an insurer to provide all benefit liabilities under the Plan," or "otherwise fully provide" for the satisfaction of "all benefit liabilities" under the Plan. 29 U.S.C. § 1341(b)(3). The Plan may be subject to various taxes and penalties for failing to file the IRS's Form 5500 annually, as well as for failing to file other forms with the appropriate authorities as required by law. Furthermore, if any excess assets remain in the Plan after the satisfaction of its liabilities, that reversion may be subject to a fifty percent tax. 26 U.S.C. § 4980; *Rinard v. Eastern Co.,* 769 F.Supp. 1416, 1427 (S.D.Ohio 1991).

 The continued existence of the Plan is serving no useful purpose. Therefore, this Court shall enter an order directing the Bankruptcy Trustee and Moore to take all steps necessary pursuant to 29 U.S.C. § 1341 to terminate the Plan and satisfy all of its liabilities.[14] Upon completion of such task, the remaining assets of the Plan (if any) shall be held by the Bankruptcy Trustee as property of the estate.

Moore's request for judgment against the Bankruptcy Trustee for legal fees, interest and penalties incurred by the Plan, and income allegedly foregone by the Plan through mismanagement, appears to have been withdrawn by Moore. To the extent such request has not been withdrawn, it is denied. Such request is without a legal basis, and no evidence was presented as to the amount of such damages.

 The Bankruptcy Trustee's request to have the Trust declared null and void as a consequence of merger must be denied. For a merger of estates "it is necessary that the two estates should be in one and the same person, at one and the same time, in one and the same right." *Newsome v. Scott*, 200 Va. 833, 840, 108 S.E.2d 369, 374 (1959) (quoting *Garland v. Pamplin*, 73 Va. (32 Gratt.) 305, 315 (1879)). A trust will not terminate as a consequence of merger unless "the legal title to the trust property and the *entire* beneficial interest

become united in one person...." Restatement (Second) of Trusts § 341 (1959) (emphasis added). In this case Moore is the trustee of the Trust, but Moore is only one of several beneficiaries of the Trust. Therefore, all estates are not "in one and the same person."

 The Bankruptcy Trustee's request that the Debtor's corporate veil be pierced so as to hold Moore personally liable for all of the Debtor's debts must also be denied. In order to pierce the Debtor's corporate veil, the Bankruptcy Trustee "must show that the corporate entity was the *alter ego*, alias, stooge, or dummy of [Moore] and the corporation was a device or sham used to disguise wrongs, obscure fraud, or conceal crime." *Cheatle v. Rudd's Swimming Pool Supply Co.*, 234 Va. 207, 212, 360 S.E.2d 828, 831 (1987). No probative evidence was produced at trial to permit us to make such a finding.

 The Trust's assets cannot be used to set off the obligations of the Debtor and Moore pursuant to section 55–19 of the Code of Virginia. Section 55–19 allows the debts of certain trust beneficiaries to be paid from trust assets. The Debtor is not a beneficiary of the Trust, and no evidence concerning the outstanding debts of Moore was introduced at trial.[15]

14. The Bankruptcy Trustee is a necessary party to terminate the Plan. The Bankruptcy Trustee controls the Debtor's powers to terminate the Plan under Section 10.3 of the Plan Agreement. The Bankruptcy Trustee also serves as Plan Administrator. Furthermore, the Bankruptcy Trustee has possession of all of the Plan's assets.

The Trust Agreement designated Moore as the original trustee of the Trust. Although Moore has made allegations that Joseph F. Manson substituted himself as trustee of the Trust, there is no evidence that Manson was substituted as trustee of the Trust pursuant to the provisions of Section 4.1 of the Trust Agreement. Manson did hold some of the Plan's assets in an account styled:

 Joseph F. Manson, Trustee
 Springfield Furniture Inc. Defined Benefit Pension Plan

We find that such designation alone did not substitute Manson as trustee of the Trust. Rather, we believe such designation identified Manson as the trustee of Debtor's estate, and made reference to the Plan in order to assist the

Bankruptcy Trustee in the segregation of the assets he possessed.

As Manson did not serve as trustee of the Trust, Moore's allegations that Manson breached his fiduciary duties as trustee of the Trust are without merit. Manson's fiduciary duties arose only from his position as Bankruptcy Trustee, and he will not be held to a higher standard.

In a letter to Sovran Bank dated September 14, 1987, Moore held himself out as trustee of the Trust. We find that he continues to serve in such capacity. We decline to address whether Moore breached his fiduciary duties as trustee of the Trust by turning over the Plan's assets to the Bankruptcy Trustee and in thereafter failing to promptly institute a legal action demanding the return of such assets.

15. During the trial on this matter it became apparent that the Bankruptcy Trustee's Exhibits II, JJ and KK were not sufficiently identified at trial, but may have been sufficiently identified in the deposition of Paul H. Abbott, Jr. (which had previously been admitted into the evidence

For the foregoing reasons we hold that the Debtor's last two contributions to the Plan may be avoided by the Bankruptcy Trustee, that the Plan should be terminated, and that any Plan assets that remain after all of the Plan's liabilities have been satisfied shall be held by the Bankruptcy Trustee as assets of the Debtor's Chapter 7 estate. An appropriate order will be entered.

of this case). Our review of the deposition of Paul Abbott indicates that Exhibits JJ and KK were sufficiently identified, and should be admitted as part of the evidence in this proceeding. The Bankruptcy Trustee's proposed Exhibit II was not sufficiently identified in the deposition of Paul Abbott, and therefore it has not been admitted as part of the evidence of this case.