**In re NORTHWEST ACCEPTANCE CORPORATION, an Oregon corporation, Plaintiff,**

v.

**Paul LANSDOWNE, Trustee of the Estate of McGrew Brothers Sawmill, Inc., Defendant.**

**Adv. No. 687–5179–W.**

United States Bankruptcy Court, D. Oregon.

Oct. 13, 1988.

Mark W. Perrin, Perrin, Gartland & Doyle, Eugene, Or., for defendant.

Albert N. Kennedy, Timothy J. Conway, Tonkon, Torp, Galen, Marmaduke & Booth, Portland, Or., for plaintiff.

## MEMORANDUM OPINION

POLLY S. HIGDON, Bankruptcy Judge.

This matter is before the court upon cross-motions for summary judgment filed by the plaintiff, Northwest Acceptance Corporation (hereinafter, Northwest) and the defendant, Paul Lansdowne, the trustee. The proceeding was commenced when Northwest filed a complaint requesting the court to issue a declaratory judgment finding that funds that constitute the overfunded portion of the debtor's (hereinafter McGrew) pension plan held by the trustee represent proceeds of property subject to Northwest's pre-petition perfected security interest in the debtor's general intangibles.

Northwest further asserts that any and all of its pre-petition security interests were continued through a post-petition financing order that the debtor executed prior to the case's conversion from Chapter 11 to Chapter 7. The trustee argues the pension refund was such a remote and contingent interest at the time of the bankruptcy filing that it could not be a general intangible to which Northwest's security interest could attach, that Northwest's claim is to money and, as such, it was not perfected; and that as a result of the restrictions placed on the language of the post-petition financing order by Judge C.E. Luckey, as interpreted by this court, Northwest was not granted a security interest in any general intangible that might have arisen post-petition.

This is a core proceeding under 28 U.S.C. § 157(b)(2)(K) and (O). The court holds that the funds held by the trustee are proceeds of a valid pre-petition security interest in a general intangible held by Northwest and do not represent an asset acquired by the debtor post-petition.

The facts are not in contention and are as follows:

1. On April 1, 1972, McGrew established the McGrew Brothers Sawmill, Inc. Hourly Employees' Retirement Plan and Trust (hereinafter the Retirement Plan). This was a single-employer defined benefit plan and trust. All funds in the trust were contributed by the employer.

2. On February 10, 1977, the Retirement Plan was amended and restated effective retroactively to April 1, 1976, in order to continue to be a qualified, tax exempt plan pursuant to the provisions of the Employee Retirement Income Security Act of 1974 (hereinafter ERISA), 29 U.S.C. § 1001 et seq.[1]

3. On October 31, 1980, McGrew entered into a loan and security agreement with Northwest wherein it granted a security interest to Northwest in, among other collateral, its general intangibles, existing and after-acquired, and the proceeds therefrom.

---

1. The court was not supplied with a copy of the 1977 Trust. There is no disagreement that both a Plan and Trust were appropriately established

to provide McGrew's employees with the benefits of the pension plan.

4. On September 28, 1981, McGrew filed a Chapter 11 petition.

5. On October 2, 1981, McGrew and Northwest entered into a post-petition financing agreement. By the terms of the agreement Northwest agreed to extend post-petition credit to McGrew and McGrew agreed to extend, post-petition, Northwest's pre-petition security interest in the debtor's collateral, including general intangibles except for the receivable due from Croman Corporation. This post-petition financing order was approved by Judge Folger Johnson.

6. On February 17, 1982, Judge C.E. Luckey added a postscript to Judge Johnson's order which stated: "This Order is not to be construed as any post-petition enhancement of any pre-petition obligation."

7. On or about October 12, 1982, McGrew elected to terminate its Retirement Plan effective November 15, 1982. On its IRS application for termination of the Retirement Plan McGrew indicated that it wanted any funds available in excess of all liabilities to beneficiaries to revert to itself as employer. The debtor as required by law, also applied to the Pension Benefit Guaranty Corporation (hereinafter, PBGC) for that agency's determination that Retirement Plan assets were sufficient to pay all obligations to employees under the Retirement Plan.

8. On December 14, 1982, McGrew's Chapter 11 case was converted to Chapter 7.

9. On January 28, 1983, the PBGC issued its notice of sufficiency. The notice of sufficiency stated the date of plan termination was November 15, 1982, the proposed date of distribution of benefits was December 1, 1982, and that the assets of the Retirement Plan and Trust were sufficient as of the proposed date of distribution to discharge all obligations of the Retirement Plan and Trust to the plan beneficiaries.

10. After purchase of annuities for the beneficiaries and a refund due to money mistakenly deposited in the Retirement Plan account the Plan trustee held $98,948.27. This fund arose as a result of erroneous actuarial calculations having been relied upon to fund the plan. The bankruptcy trustee made demand on the plan trustee for the funds as an asset of the estate through commencement of an adversary proceeding and by order of this court such funds were turned over to the bankruptcy trustee.

11. McGrew's pre-petition outstanding indebtedness to Northwest exceeds $98,948.27. McGrew's post-petition outstanding indebtedness to Northwest exceeds $98,948.27.

12. The relevant terms of McGrew's Retirement Plan are:

9.01. Amendment.

The Employer shall have the right at any time and from time to time to amend, in whole or in part, any or all of the provisions of this Agreement. However, no such amendment shall authorize or permit any part of the Trust Fund (other than such part as is required to pay taxes and administration expenses) to be used for or diverted to purposes other than for the exclusive benefit of the Participants or their Beneficiaries or estates; no such amendment shall cause any reduction in the Accrued Benefit of any Participant theretofore, or cause or permit any portion of the Trust Fund to revert to or become the property of the Employer; and no such amendment which affects the rights, duties or responsibilities of the Trustee and Administrator may be made without the Trustee's and Administrator's written consent. Any such amendment shall become effective upon delivery of a duly executed instrument provided that the Trustee shall in writing consent to the terms of such amendment.

10.01. Termination.

The Employer shall have the right at any time to terminate the Plan by delivering to the Trustee and Administrator written notice of such termination. A complete discontinuance of the Employer's contributions to the Plan shall be deemed to constitute a termination. Upon any ter-

mination, partial or complete, or complete discontinuance of contributions, all unallocated amounts shall be allocated in accordance with the provisions hereof and the Accrued Benefit of each Participant shall become fully Vested and shall not thereafter be subject to forfeiture. Upon termination of the Plan, the Employer, by written notice to the Trustee, may direct either:

(d) Priority of Benefits—Upon approval from the Pension Benefit Guaranty Corporation of the Plan termination, the administrator shall allocate the assets of the Plan among Participants and Beneficiaries in the following order of priority and subject in any event to the provisions of the Act:

(i) First to that portion of each Participant's Accrued Benefit which is derived from his Voluntary Contributions, if any.

(ii) Equally among individuals in the following two categories:

(1) Benefits to Retired Participants and their Beneficiaries to whom payments commenced at least three (3) years prior to the termination date, based on Plan provisions in effect during the five (5) year period ending on such date; the lowest benefit in any pay status during the most recent three (3) year period shall be considered the benefit in pay status for such period.

(2) Benefits as respects a Participant wherein payment would have commenced at least three (3) years prior to the termination date if the Participant had actually retired, based on the lowest benefit determined under the Plan provisions in effect during the five (5) year period ending on such date.

(iii) All other benefits guaranteed (insured under the Act determined without regard to Section 4022(b)(5) thereof); and additional benefits, if any, under this subparagraph if Section 4022(b)(6) of the Act did not apply.

(iv) All other (uninsured) Vested benefits.

(v) All other benefits under the Plan.

(vi) Return of any excess funds to the Employer or reallocated to the Participants on the basis of their Accrued Benefits, if authorized by the Employer.

12.02. Alienation.

No benefit which shall be payable out of the Trust Fund to any person (including a Participant or his Beneficiary) shall be subject in any manner to anticipation, alienation, sale, transfer, assignment, pledge, encumbrance, or charge, and any attempt to anticipate, alienate, sell, transfer, assign, pledge, encumber, or charge the same shall be void; and no such benefit shall in any manner be liable for, or subject to, the debts, contracts, liabilities, engagements, or torts of any such person, nor shall it be subject to attachment or legal process for or against such person, and the same shall not be recognized by the Trustee, except to such extent as may be required by law.

12.03. Construction of Agreement.

This Plan and the Trust executed in conjunction with it shall be construed and enforced according to the Act and the laws of the State of Oregon, other than its laws respecting choice of law, to the extent not preempted by the Act.

12.07. Prohibition Against Diversion of Funds.

It shall be impossible by operation of the Plan or of the Trust, by natural termination of either, by power of revocation or amendment, by the happening of any contingency, by the collateral arrangement or by any other means, for any part of the corpus or income of the Trust Fund maintained pursuant to the Plan or any funds contributed thereto to be used for, or diverted to, purposes other than the exclusive benefit of Participants, Retired Participants, or their Beneficiaries. Except upon termination of the Trust, any balance remaining in the Trust Fund because of erroneous actuarial computations may be repaid to the Employer after it has been certified by the Trustee or Administrator that all liabilities under the Plan are satisfied.

The Internal Revenue Code (IRC) permits the establishment of trusts in order to fund pension plans in which the income from the corpus of the trust is tax exempt and taxation of the amount contributed by the employer on behalf of the employee is deferred. 26 U.S.C. § 401(a); 26 U.S.C. § 401(o); 26 U.S.C. § 402; 26 U.S.C. § 501(a). The preferential tax treatment afforded employers and employees by such plans encouraged some abuse of the system. One of the abuses was the creation of a substantial number of pension plans which were not adequately funded to provide the stated coverage to employees upon retirement. The Employee Retirement Income Security Act of 1974 was passed in order to insure that pension plans established pursuant to the Internal Revenue Code vested accrued benefits in employees with a significant period of service, met minimum funding standards, and maintained plan termination insurance. 29 U.S.C. § 1001 *et seq.* A pension is only eligible for preferential tax treatment if it meets certain qualifications. One of the qualifications established by the Internal Revenue Code for preferential tax treatment is the so-called "exclusive benefit" test. It is reflected in 26 U.S.C. § 401(a)(2) which states:

(a) Requirements for qualification.—A trust created or organized in the United States and forming part of a stock bonus, pension, or profit-sharing plan of an employer for the exclusive benefit of his employees or their beneficiaries shall constitute a qualified trust under this section—

(2) if under the trust instrument it is impossible, at any time prior to the satisfaction of all liabilities with respect to employees and their beneficiaries under the trust, for any part of the corpus or income to be (within the taxable year or thereafter) used for, or diverted to, purposes other than for the exclusive benefit of his employees or their beneficiaries (but this paragraph shall not be construed, in the case of a multiemployer plan, to pro-

hibit the return of a contribution within 6 months after the plan administrator determines that the contribution was made by a mistake of fact or law (other than a mistake relating to whether the plan is described in section 401(a) or the trust which is part of such plan is exempt from taxation under section 501(a), or the return of any withdrawal liability payment determined to be an overpayment within 6 months of such determination)....

26 U.S.C. § 401(a)(2).

ERISA contains a similar provision. It states:

(1) Except as provided in paragraph (2), (3), (4) or subsection (d) of this section, or under sections 1342 and 1344 of this title relating to termination of insured plans), the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan. 29 U.S.C. § 1103(c).

This language is reflected in § 12.07 of the Retirement Plan.[2]

In order to terminate a pension plan the plan administrator must give notice to the PBGC of the proposed date of termination, and the trustee may not distribute funds to beneficiaries under the termination procedure until a notice of sufficiency to pay employee benefits is received from the PBGC. 29 U.S.C. § 1341(a). The determination of sufficiency and priority of payments of assets is made pursuant to the provisions of 29 U.S.C. § 1344. After listing the priority of payment of employee benefits that section provides:

(d)(1) Any residual assets of a single-employer plan may be distributed to the employer if—

(A) all liabilities of the plan to participants and their beneficiaries have been satisfied,

---

2. The parties agree to this interpretation of § 12.07. The section reads otherwise; this ap-

pears to be the result of a typographical error in placing a period after the word "Beneficiaries."

(B) the distribution does not contravene any provision of law, and

(C) the plan provides for such a distribution in these circumstances.

29 U.S.C. § 1344(d).[3]

Section 10 of the Retirement Plan reflects the provisions of 29 U.S.C. § 1344(d)(1) by providing for distribution to McGrew of "residual assets" after all other plan liabilities, as specified, are met.[4]

In *Schuck v. Gilmore Steel Corp.*, 784 F.2d 947 (9th Cir.1986), the Ninth Circuit Court of Appeals recognized that 29 U.S.C. § 1344(d)(1)(C), which allows distribution of excess funds to the employer on termination, is an exception to the otherwise rigid rule that plan assets must be held for the exclusive benefit of plan participants. *Id.* at 951. Further, it identifies these funds as a "reversion." *Id.*

 In *Schuck* the court was not required to address whether, in fact, the employer had a property interest created by the terms of the plan and trust and, if so, what the nature of that interest was. This court believes that at least by the time of the execution of the Plan amendment, on February 10, 1977, retroactive to April 1, 1976, McGrew held a property interest in the assets of the Plan and Trust. Further, it believes the form of that interest is a reversion. At common law reversions were created by operation of law. If the owner of an estate granted something less than a fee simple that interest not granted remained in the grantor and was a property interest known in the law of estates as a reversion. Although it is a future estate, (the right of possession and enjoyment being deferred) a reversion is a present, vested estate. Reversions may exist in personalty. They are descendible, devisable, alienable and assignable. Am.Jur.2d *Estates* §§ 171, 172 and 173 (1966) (reprinted from 28 Am.Jur.2d.)

A reversion is distinguished from a possibility of a reverter. The latter is also a future interest which remains in the grantor after he has created a third party possessory estate. The possibility of reverter is not a present vested estate but only the possibility of having an estate at a future time. *Estates* § 183. Although such possibility of reverter is descendible it is questionable whether it is alienable. *Estates* § 184.

The easiest way to distinguish between a reversion and a possibility of a reverter is to identify the nature of the prior possessory estate created by the grantor. The reversioner has granted an estate less than fee and will take possession upon the natural termination of the prior estate. On the other hand a possibility of reverter only exists where there has been created an estate in fee simple determinable. A determinable fee has all the attributes of a fee simple but *may* end by some act circumscribing its continuance. *Estates* § 22.

 In order to identify the nature of the prior interest granted to the Retirement Plan and Trust beneficiaries by McGrew when it executed those documents this court has examined the structure and language of the Plan in its entirety. When McGrew created the Plan it granted all participants, upon plan termination, fully vested accrued benefits as defined by § 1.01 of the Plan. § 10.01. It did not grant to the participants, upon termination, all the funds held in the trust (which would constitute all contributions and rollovers plus interest thereon less benefits earlier distributed.) The contributions were based on actuarial calculations which are known to vary. § 4.02. Thus the trust funds could not without qualification be identical to the participants' fully vested accrued benefits. Any trust funds existing after distribution to participants of their interest (fully vested accrued benefits) would auto-

---

**3.** The above section does not apply to any plan assets attributable to employee contributions. There are none here.

**4.** The parties appear to agree, and this court concurs, that § 10.01(d)(vi) provides for the re-

turn of excess funds to McGrew unless McGrew affirmatively elects to have any such funds distributed to the participants. McGrew did not so elect.

matically be reversionary funds at common law.

The grantor-employer's reversionary interest in the assets of a single-employer retirement plan and trust does not arise by operation of law. It is authorized by the provisions of 29 U.S.C. § 1344(d)(1) if the conditions of that subsection are met. There is no controversy that McGrew has met those conditions.

The trustee argues that until the post-filing plan termination it was not known either whether, or to what extent, trust funds would return to the employer. Thus at the time McGrew filed its bankruptcy petition its interest, if any, in the funds was too remote or contingent for a security interest to attach. This court has already identified McGrew's interest in the trust funds as a reversion. Reversions are recognized present estates in property and are neither remote nor contingent. As reversions may exist in personalty and personalty, unlike real property, is subject to being totally consumed, it is logical one may hold a vested reversionary interest with enjoyment postponed with a present value which, upon elimination of the prior possessory interest at some future date, may then be valueless.

The trustee also asserts that McGrew held no alienable property right in the trust fund prior to the bankruptcy filing. Northwest could not, therefore, in 1980, obtain a security interest in any property right which McGrew might have had in the trust fund. There is nothing in the nature of McGrew's interest in the trust fund, as identified by the court, which makes the interest inalienable. Reversions are alienable. Thus one must look elsewhere for the source of any restrictions on the alienability of McGrew's reversionary interest.

■ The trustee argues that to the extent McGrew might otherwise be found to have had a property interest in the fund in 1980 which could be categorized under Article 9 of the Oregon's version of the Uniform Commercial Code it would avail Northwest nothing as McGrew was prohibited by the provisions of ERISA from granting it any security interest in such

property. This issue was addressed by the court in *In re Long Chevrolet, Inc.*, 79 B.R. 759 (N.D.Ill.1987). In doing so the court makes two points with which this court concurs. First, although 29 U.S.C. § 1144(a) of ERISA states it supersedes state laws insofar as they "related to" any employee benefit plan, as the quoted phrase has been interpreted by the United States Supreme Court a state commercial law generally authorizing security interests in property cannot be said to "relate to" the McGrew Retirement Plan. Like the debtor-in-possession in *Long* the trustee here "has not identified any provision or purpose of ERISA that is in any way inconsistent with the general commercial law principles of Article 9" of the Uniform Commercial Code as enacted in Oregon. *Long*, 79 B.R. at 763.

Second, the language of 29 U.S.C. § 1103(c) (which is reflected in § 12.07 of the Retirement Plan) which requires restriction of the benefits of the plan to the *participants* has stated exceptions to its application. One of these exceptions is the provisions of 29 U.S.C. § 1344. That section authorizes return of excess trust funds to the employer on plan termination. The language of ERISA neither expressly prohibits, nor supports an interpretation that it prohibits, a grant by the *employer* of a security interest in its interest in such funds. *Id.*

The trustee asserts *Long* is distinguishable from the proceeding herein on the facts. In *Long* the Plan was terminated pre-petition. The trustee asserts the debtor probably knew the amount of the excess funds and may have used those funds as the basis for negotiation with the secured creditor thus raising an issue of bad faith. Because the debtor in *Long* had determined there would be excess funds and the amount thereof prior to granting a security interest in general intangibles to the creditor the *Long* debtor had a sufficient property interest pre-filing to which a security interest could attach.

The court believes the trustee's attempt to distinguish *Long* on the facts fails. First, the trustee assumes facts which do

not specifically appear in the reported opinion (that is, the extent of the parties' knowledge of the existence of excess funds and amount thereof at the time the security interest was granted to the creditor). Further, in addressing a preferential transfer issue, the *Long* court specifically states that the debtor acquired rights in the property (within the meaning of 11 U.S.C. § 547(e)(3)), through the statutory provisions of 29 U.S.C. § 1344(d) and the terms of the plan itself. That analysis is consistent with this court's finding that McGrew obtained a present reversionary interest in the trust assets at the time it executed its Plan through the terms of § 10.01(d)(vi) as authorized by 29 U.S.C. § 1344(d)(1)(C). McGrew had sufficient rights in the collateral in 1980 within the meaning of O.R.S. 79.2030 to allow Northwest's security interest to attach.

■ The trustee states McGrew's contingent possibility of a refund is simply not the kind of property interest which the authors of the Uniform Commercial Code (U.C.C.) intended to be treated as a general intangible under Article 9. In support of this position he quotes a portion of the Official Comment to § 9–106 of the U.C.C.:

> The term "general intangibles" brings under this Article miscellaneous types of contractual rights and other personal property *which are used or may become customarily used as commercial security.* [Emphasis added] Examples are goodwill, literary rights and rights to performance. Other examples are copyrights, trademarks and patents, except to the extent that they may be excluded by Section 9–104(a).... Note that this catch-all definition does not apply to money or to types of intangibles which are specifically excluded from the coverage of the Article (Section 9–104)....

Memorandum in Support of Defendant's Motion for Summary Judgment at p.p. 8–9 (Filed Jan. 15, 1988).

This court recently held that an interest in a partnership was a general intangible.

*See, Charter First Mortgage, Inc. v. The Oregon Bank* (In re Charter First Mortgage, Inc.), Ch. 11 Case No. 683–07420, Adv. No. 684–6059, slip op. at 25, (Bankr.D.Or. May 24, 1988). In so holding I found the language of Article 9 supports a broad interpretation of that category. *Also see, In re Sumner,* 69 B.R. 758 (Bankr.D.Or.1986). Further, within the context of the facts of this proceeding the court believes the language of the Official Comment to U.C.C. § 9–106, which indicates a general intangible (in contrast to an "account") is a right to payment of money that is *not* for goods sold or leased or for services rendered, further supports a finding that McGrew's interest in the fund, if available for collateralization, can only be a general intangible. Official Comment U.C.C. § 9–106.

The trustee claims that since the overfund is, in fact, in the form of cash Northwest does not have a validly perfected security interest therein because, first, a general intangible clause does not include within its term, money, and, second, even if it did, Northwest did not perfect its interest by possession as required by O.R.S. 79.-3040(1). *And, see,* O.R.S. 79.1060(2).

Northwest does not have a security interest in money. It has a security interest in McGrew's reversionary interest in the trust assets. This interest is a general intangible and was duly perfected by filing. This interest arose at the time of the execution of the Plan and Trust. Its existence and identity are unaffected by the type of assets held by the trust.[5]

As this court has found that Northwest had a valid, perfected pre-petition security interest in the funds reverting to McGrew it finds it unnecessary to address any questions raised by the language of the post-petition financing order entered in this case.

This Memorandum Opinion contains the court's findings of fact and conclusions of law and pursuant to Bankruptcy Rule 9014, which incorporates Rule 7052, they will not be separately stated.

---

5. § 8.01(a) of the Plan authorizes the trustee to invest in any form of asset consistent with the "funding policy" of the Plan and § 10.0(b) authorizes the employer, upon termination, to direct distributions in cash or in kind.

An order consistent herewith shall be entered.

## ORDER

This matter having come before the court upon the parties' cross motions for summary judgment and the court having entered its Memorandum Opinion in this proceeding; now, therefore,

IT IS HEREBY ORDERED that the motion for summary judgment filed by plaintiff, Northwest Acceptance Corporation is hereby granted and the motion for summary judgment filed by defendant is denied.