In re **WINGSPREAD CORPORATION, et al., Debtors.**

**Harold YOUNG, as Chapter 7 Trustee of Wingspread Corporation and its twelve subsidiaries, Debtors, Plaintiff,**

v.

**PARAMOUNT COMMUNICATIONS INC., f/k/a Gulf & Western Industries, Inc., Kayser–Roth Corporation, and the Bank of New York, in its capacity as Trustee of the Wingspread Corporation Salaried Retirement Plan, Defendants.**

Bankruptcy Nos. 87–B–10618 to 87–B–10630.

Adv. No. 92–9518A.

United States Bankruptcy Court, S.D. New York.

June 14, 1993.

Hahn & Hessen by George Hahn and Rosanne Thomas, New York City, for Harold Young, as Chapter 7 Trustee of the Wingspread Corp. and its twelve subsidiaries, debtors.

Weil Gotshal & Manges by Marcia Goldstein and Kevin Barrett, New York City, for Paramount Communications Inc. and Kayser–Roth Corp.

*MEMORANDUM DECISION*

TINA L. BROZMAN, Bankruptcy Judge.

On April 6, 1987, Wingspread Corporation and its related subsidiaries filed for voluntary relief under Chapter 11 of the Bankruptcy Code. The cases were from their inception and remain to this day extraordinarily contentious. The conversion of the reorganization cases to liquidations under Chapter 7 did not abate the litigation. I likely have issued more decisions in these cases than in any other case during my judicial tenure.

In this particular dispute, Harold Young, the Chapter 7 trustee charged with the liquidation of Wingspread Corporation and its twelve subsidiaries ("Wingspread"), on the one hand, and defendants Paramount Communications and Kayser–Roth Corporation (collectively, "the Paramount Defendants"), on the other, each seek summary judgment declaring them entitled to certain reversionary assets contained in an overfunded employee benefits plan established by Wingspread pursuant to the 1985 leveraged buyout of Kayser–Roth.

## I.

Wingspread was a holding company, incorporated primarily to facilitate a management-led leveraged buyout in which Wingspread acquired certain assets and stock from Kayser–Roth Corporation ("Kayser–Roth"). At the time of the LBO, Paramount Communications Inc. ("Paramount"), formerly known as Gulf & Western Industries, Inc., was the corporate parent of Kayser–Roth. As part of the LBO and pursuant to a purchase agreement dated June 20, 1985, Kayser–Roth transferred certain assets and the concomitant liabilities of the Kayser–Roth Salaried Retirement Plan (K–R Plan) to Wingspread. *See* Wingspread Statement of Material Facts at Exh. A. Wingspread thereafter adopted its own pension plan (the "Wingspread Plan") *Id.* Exh. B, identical in all material aspects to the K–R Plan. *Id.* Exh. A at Section 12(b)(xv), p. 67. The Wingspread Plan protected accrued benefits of certain of Wingspread's employees who had been employed by Kayser–Roth prior to the LBO

and who had participated in the K–R plan as of July 2, 1985. It also covered new employees of Wingspread subsequent to the LBO. Plan assets were held and invested by the Bank of New York, as trustee of the Wingspread Plan. The Purchase Agreement provided, among other things, that should Wingspread choose to terminate the Plan during the first five years subsequent to the LBO, and should there be at that time a surplus of assets over liabilities, Kayser–Roth would have a right to payment of some amount of cash derived from a stated formula based on the reversionary assets. *Id.* at Section 12(b)(xix), at pp. 71–72. More particularly, if Wingspread terminated the Plan during the fourth or fifth years following the LBO, and if there were a surplus, the amount paid to Kayser–Roth would be credited against the obligations due under the note which constituted part of the purchase price Wingspread paid for the assets. In other words, if the Wingspread Plan were terminated within the fourth or fifth years after the acquisition, at a time when the Plan's assets exceeded liabilities, Wingspread would be obligated to utilize a specified portion of the surplus in the Wingspread Plan, which in the absence of the purchase agreement would flow only to Wingspread, to prepay part of Wingspread's indebtedness to Kayser–Roth.

At the time that Wingspread purchased the businesses, the K–R Plan, which until then had been funded by Kayser–Roth, was overfunded. In October, 1989, when I authorized and directed the Chapter 7 Trustee to terminate the Wingspread Plan and distribute its assets to Plan participants and their beneficiaries, the Plan was still overfunded. That termination gave rise to a reversionary asset pool of approximately $840,000, which funds have become the focus of this dispute. Recognizing that whatever distribution, if any, which may be made to unsecured creditors in these cases will be modest at best, the Paramount Defendants would very much like to be declared the owners of a ratable share of the reversionary asset pool. The rather unpalatable alternative, from their perspective,

is that they will be denominated, as the chapter 7 trustee urges is appropriate, unsecured creditors, owed a claim by virtue of the provisions in the Purchase Agreement obligating Wingspread to make a payment to Kayser–Roth upon the termination of the Wingspread Plan within the relevant time period.

In October, 1990, having terminated the Wingspread Plan, the chapter 7 trustee sought an order directing the Bank of New York as the Wingspread Plan trustee to pay over to him the reversionary assets for distribution to the debtors' estates. The chapter 7 trustee claimed that pursuant to section 13.6 of the Wingspread Plan, any amounts which remained after the Plan trustee satisfied all liabilities of the trust with respect to Plan participants and their beneficiaries would revert to Wingspread. See Wingspread Statement of Material Facts Exh. B, § 13.6 at p. 81. Paramount objected, asserting that it retained a property interest in these reversionary assets. Because of the dispute, I directed the Wingspread Plan trustee to continue holding these reversionary assets pending resolution of this matter.

In July 1992, almost two years later, the chapter 7 trustee commenced this adversary proceeding, seeking 1) a declaration that the estates' interest in these reversionary assets was superior to any claim that the Paramount Defendants might have to them, and 2) an order directing the Wingspread Plan trustee to turn over those reversionary assets to the trustee for distribution to the estates' creditors. The Paramount Defendants answered in September, 1992, asserting counterclaims which alleged that Kayser–Roth had never sold its interest in the reversionary assets when it entered into the Purchase Agreement with Wingspread and therefore Wingspread held these assets in trust for Kayser–Roth. Id. Exh. E. After the trustee replied to the counterclaims, both Wingspread and the Paramount Defendants moved for summary judgment with respect to the issue of ownership of the reversionary assets. The Paramount Defendants argue that prior to the purchase and LBO, Kayser–Roth was the "employer" of the K–R Plan and the

entity responsible for overfunding that plan. Thus, they say, under ERISA, Kayser–Roth held an ownership interest in the reversionary assets as the "employer" of the K–R Plan. As Kayser–Roth puts it, the parties did not intend that Kayser–Roth would transfer its reversionary interest to Wingspread as part of the purchase and LBO. In fact, the Paramount Defendants point out, the Purchase Agreement and subsequent Wingspread Plan provided, among other things, that should Wingspread terminate the Wingspread Plan within the first five years after the purchase and LBO, Kayser–Roth would be paid a certain amount derived by formula based on those very reversionary assets. Thus, notwithstanding the subsequent purchase and LBO, Kayser–Roth asserts that it was the "obvious intent" of the parties that it retain its interest in these reversionary assets. The Wingspread Plan, by its terms, they say, is "clear evidence" that Kayser–Roth and Wingspread "both understood that Kayser–Roth owned an interest in the surplus pension assets" created upon the chapter 7 trustee's termination and liquidation of the Plan, and that both parties "intended that Kayser–Roth would retain its reversionary interest in the transferred assets for a stated period of time." See Paramount Defendants' Memorandum of Law at pp. 7–9. Since it is undisputed that Wingspread terminated the Plan within five years of the purchase and LBO, Kayser–Roth concludes, its interest in these reversionary assets is superior to that of the chapter 7 trustee, with the chapter 7 trustee holding these assets in trust for the Paramount Defendants.

The trustee concedes that Kayser–Roth was the "employer" under the old K–R Plan for purposes of ERISA and the holder of the exclusive ownership interest in the reversionary assets under the old K–R Plan. However, he urges, subsequent to the purchase and LBO, Wingspread became the "employer" under the Wingspread Plan. Whatever reversionary interest Kayser–Roth previously held, the argument continues, Kayser–Roth transferred to Wingspread pursuant to the purchase

and LBO. As evidence, Wingspread points to the fact that the Purchase Agreement, which memorialized the LBO, is devoid of any terms or conditions which would have assigned Kayser–Roth rights in the reversionary assets. Wingspread asserts that section 12(b)(xix) of the Purchase Agreement granted Kayser–Roth nothing more than a right to payment from Wingspread, which arose due to Wingspread's having terminated its Plan within five years after the purchase. Clearly, Wingspread posits, if Kayser–Roth intended to retain its interest in the reversionary assets, Kayser–Roth, which drafted the Purchase Agreement, would have expressly exempted those assets from transfer. That Kayser–Roth did not, Wingspread concludes, is a clear indication that Kayser–Roth transferred the assets to Wingspread.

## II.

### SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c), made applicable to these proceedings by Federal Rule of Bankruptcy Procedure 7056, provides that summary judgment is appropriate if the court determines that the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986); *Cargill, Inc. v. Charles Kowsky Resources, Inc.,* 949 F.2d 51, 55 (2d Cir. 1991); *In re Ionosphere Clubs, Inc.,* 147 B.R. 855, 860 (Bankr.S.D.N.Y.1992). A fact is considered material if it "might affect the outcome of the suit under governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. In considering a motion for summary judgment, "the court's responsibility is not to resolve disputed issues of fact, but to assess where there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Cartier*

*v. Lussier,* 955 F.2d 841, 845 (2d Cir.1992); *Knight v. U.S. Fire Insurance* ☐ 804 F.2d 9, 11 (2d Cir.), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987).

■ I am mindful that on cross-motions for summary judgment, neither motion can be granted unless the moving party is entitled to judgment as a matter of law upon genuinely undisputed facts. *Bank of America National Trust and Savings v. Gillaizeau,* 766 F.2d 709, 715 (2d Cir.1985); *Paganucci v. City of New York,* 785 F.Supp. 467, 474 (S.D.N.Y.1992), *aff'd,* 993 F.2d 310 (2d Cir.1993); *McLaughlin v. American Federation of Musicians of U.S. and Canada,* 700 F.Supp. 726, 732 (S.D.N.Y.1988). The fact that both sides move for summary judgment does not make the granting of summary judgment more available. *Home Insurance Co. v. Aetna Cas. & Sur. Co.,* 528 F.2d 1388, 1390 (2d Cir.1976).

### CONTRACT AMBIGUITIES

■ Whether an ambiguity exists with respect to a contract is a threshold question of law to be resolved by the court. *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993). Ambiguous language is that which is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business. *Id., citing Walk–In Medical Center, Inc. v. Breuer Capital Corp.,* 818 F.2d 260, 263 (2d Cir.1987). However, straining a contract's language beyond its reasonable and ordinary meaning does not create an ambiguity. *Seiden Associates, Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 428 (2d Cir.1992). Nor may an ambiguity be found where the contract has a definite meaning, and where no reasonable basis exists for a difference of opinion about that meaning. *Hunt, Ltd. v. Lifschultz Fast Freight, Inc.,* 889 F.2d 1274, 1277 (2d Cir.1989). Thus, in those instances where the provisions of a contract convey a definite and precise meaning absent

any ambiguity, summary judgment may be granted. *Williams & Sons Erectors, Inc. v. South Carolina Steel Corp.*, 983 F.2d 1176, 1183–84 (2d Cir.1993), *citing Seiden,* 959 F.2d at 428.

■ When, however, the provisions of a contract are susceptible to conflicting constructions and when there is also relevant extrinsic evidence of the parties' actual intent, then the meaning of those provisions becomes an issue of fact barring the grant of summary judgment. *Id.* at 1183–84. Said differently, when the parties' intent cannot be definitely and precisely gleaned from a reading of the contract, the parties ought be afforded an opportunity to present extrinsic evidence to establish their intent and summary judgment ought not be granted. *Brass,* 987 F.2d at 150; *Christiania General Insurance Corp. of New York v. Great American Insurance Co.,* 979 F.2d 268, 274 (2d Cir.1992); *Ginett v. Computer Task Group, Inc.,* 962 F.2d 1085, 1097 (2d Cir.1992). Neither side here suggests that there is any ambiguity or any extrinsic evidence which would aid in divining the intent behind an asserted ambiguity.

### ERISA

■ The Employee Retirement Income Security Act of 1974 (ERISA), codified as 29 U.S.C. § 1001 *et seq.* (ERISA), provides that in case of termination of a single-employer plan, after allocation of plan assets among the participants and beneficiaries, any residual assets of that single-employer plan may be distributed to the employer, if: 1) all liabilities of the plan to participants and their beneficiaries have been satisfied, 2) the distribution does not contravene any provision of law, and 3) the plan provides for such a distribution in these circumstances. 29 U.S.C. § 1344(d)(1); *Rinard v. Eastern Co.,* 978 F.2d 265, 268 (6th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1843, 123 L.Ed.2d 468 (1993); *Wilson v. Bluefield Supply Co.,* 819 F.2d 457, 466 (4th Cir. 1987); *Delgrosso v. Spang and Co.,* 769 F.2d 928, 934 (3d Cir.1985), *cert. denied,* 476 U.S. 1140, 106 S.Ct. 2246, 90 L.Ed.2d

692 (1986). This is an exception to the otherwise rigid rule that plan assets must be held for the exclusive benefit of plan participants. *Schuck v. Gilmore Steel Corp.,* 784 F.2d 947, 951 (9th Cir.1986). Section 1344 ensures that employers will not be penalized for overfunding plans in an abundance of caution or as a result of a miscalculation on the part of an actuary. *Lynch v. J.P. Stevens & Co., Inc.,* 758 F.Supp. 976, 994 (D.N.J.1991). Accordingly, employees are protected to the extent of their specific benefits, but will not receive any windfalls due to the employer's mistake in the amount necessary to keep the plan on a sound financial basis. *Id.; Morales v. Pan American Life Ins. Co.,* 718 F.Supp. 1297 (E.D.La.1989), *aff'd,* 914 F.2d 83 (5th Cir.1990). The parties here do not dispute that these criteria for distribution to the employer have been met. Rather, their dispute centers on whether Kayser–Roth, in transferring to Wingspread the assets and liabilities of the K–R Plan as part of the purchase, transferred its ownership of the reversionary assets of that overfunded plan.

■ ERISA defines "employer" as any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan, and includes a group or association of employees acting for an employer in such capacity. 29 U.S.C. § 1002(5); *Mason Tenders District Council Welfare Fund and Annuity Fund v. Dalton,* 1987 WL 5808, *5 (S.D.N.Y. January 16, 1987). Person, as defined in ERISA, includes individuals, partnerships, joint ventures, corporations, etc. 29 U.S.C. § 1002(9); *Connors v. B.M.C. Coal Co.,* 634 F.Supp. 74, 75 (D.D.C.1986). ERISA also references the term employer to the regulations promulgated under section 414(c) of the Internal Revenue Code. *Pension Ben. Guar. Corp. v. Ouimet Corp.,* 711 F.2d 1085, 1094 (1st Cir.), *cert. denied,* 464 U.S. 961, 104 S.Ct. 393, 78 L.Ed.2d 337 (1983), *citing* 29 U.S.C. § 1301(b)(1); *Central Transport, Inc. v. Central States, Southeast and Southwest Area Pension Fund, et. al.,* 640 F.Supp. 56, 58 (E.D.Tenn.1986), *aff'd,* 816 F.2d 678

(6th Cir.), *cert. denied,* 484 U.S. 926, 108 S.Ct. 290, 98 L.Ed.2d 250 (1987).[1]

In the context of this case, the Wingspread Plan comported with these applicable provisions. The Plan defined employer as

> ... the entity that establishe[d] or maintaine[d] the plan; any other organization which has adopted the plan with the consent of such establishing employer; and any successor of such employer.

*See* Wingspread Statement of Material Facts Exh. B at § 2.9. And with respect to the Plan's definition of "affiliated employer," which addressed such terms as "controlled group" and "trade or business," those terms were to comport with the definitions provided in the relevant statutory provisions of the Internal Revenue Code. *Id.* at § 2.2. There is no question but that under the Wingspread Plan, Wingspread was the entity that acted directly as the employer in relation to that plan. 29 U.S.C. § 1002(5).

■■■■■ ERISA provides that in the context of plan termination, so long as the employer complies with the mandates of section 1344(d)(1), and so long as the plan in question provides as such, then to the extent any surplus exists after full distribution to plan participants and their beneficiaries, the employer maintains a reversionary interest in it. *Creasy v. Coleman Furniture Corp.,* 763 F.2d 656, 662 (4th Cir. 1985). And although the right to recover is a future estate, the reversion itself is a present, vested estate. *Northwest Acceptance Corp. v. Lansdowne,* 93 B.R. 243, 247 (Bankr.D.Or.1988). As a result, the employer's reversionary interest falls within the broad reach of section 541(a) of the Bankruptcy Code and is considered property of the debtor's estate. *Creasy,* 763 F.2d at 662; *In re Springfield Furniture, Inc.,* 145 B.R. 520, 537–38 (Bankr.E.D.Va.1992); *In re Bicoastal Corp.,* 136 B.R. 290, 295 (Bankr.M.D.Fla.1992). Not only does the employer have a present interest in those reversionary assets, but that reversionary interest is transferable and alienable. *In re Long Chevrolet, Inc.,* 79 B.R. 759, 763 (N.D.Ill.1987) ("[w]e do not see anything in ERISA that expressly or impliedly prohibits an employer from granting a security interest in its expected residual assets, nor do we think that such a transaction would, without more, contravene public policy"); *accord Northwest Acceptance,* 93 B.R. at 243. Thus, as both parties recognize, we begin with the proposition that prior to the LBO, Kayser–Roth held the interest in the reversionary assets under the old K–R Plan, an intangible property interest that was freely alienable.

■■■■■ I do not agree with the Paramount Defendants that they ought properly be deemed to be the employer. There is no funded K–R Plan any longer. Its assets were transferred to Wingspread for inclusion in the Wingspread Plan. *See* Wingspread Statement of Material Facts Exh. H at § 12(b)(xv), p. 67. Whatever rights Kayser–Roth had as "employer" under the K–R Plan disappeared upon enactment of the Wingspread Plan. Indeed, the Wingspread Plan provided that the term "employer" in that Plan would refer to the entity that established or maintained the plan. *See* Wingspread Statement of Material Facts Exh. B at § 2.9, p. 2. And when the chapter 7 trustee terminated the Wingspread Plan, only Wingspread, as the "employer" thereunder, was entitled to the reversionary assets upon termination and liquidation of that Plan.

The Purchase Agreement and Wingspread Plan are clear and unambiguous with respect to ownership of the reversionary asset pool; those assets are property of Wingspread's estate. Section 12(b)(xix) of the Purchase Agreement does not provide that the assets in the Wingspread Plan belong to the Paramount Defendants. It does not even provide that the Paramount Defendants are entitled to a *pro rata* distribution of the property in the Plan after payment of the Plan's liabilities. Rather, the Plan states that Kayser–Roth shall be entitled to receive from Wingspread, and

---

**1.** Internal Revenue Code section 414(c) and the related regulations also define controlled groups of businesses using the principles of the Internal Revenue Code section 1563 definitions. *Ouimet,* 711 F.2d at 1094; *Central Transport,* 640 F.Supp. at 58.

not from the Plan trustee, **cash** in an amount to be derived pursuant to a particular formula "on account of any excess assets remaining" after Wingspread has satisfied the liabilities under Wingspread's Plan. There is nothing in the Wingspread Plan or the Purchase Agreement which required Wingspread to fund its Plan with cash. Indeed, the Plan could be funded with other types of assets, such as annuity contracts. Yet what Kayser–Roth was entitled to on termination was not a percentage of the Plan assets, but cash, perhaps but not necessarily derived from the Plan assets.

To my mind, these provisions gave Kayser–Roth a mere right to payment of cash, or claim, under section 101(5) of the Bankruptcy Code if the Wingspread Plan were terminated within the requisite time frame. *See Bicoastal,* 136 B.R. at 294 (A right to payment, or a claim, is inconsistent with the concept of ownership. Thus, the court denied the government's request for the imposition of a trust on the debtor's reversionary assets.)

If Kayser–Roth intended to retain its interest in the reversionary assets under its old K–R Plan, it could have expressly excluded those assets from transfer under § 1(b) of the Purchase Agreement. *See* Wingspread Statement of Material Facts Exh. A, § 1(b) at p. 6. Certainly Kayser–Roth recognized that a reversionary asset pool might exist, for in drafting the Purchase Agreement, it made express mention of that asset pool in section 12(b)(xix) of the Agreement. Yet it did not exclude those assets from transfer.

My conclusion is buttressed by the provision that any payment of cash to Kayser–Roth during the fourth or fifth years of the Wingspread Plan would not be a payment additional to the obligations arising under the Note but would reduce the payments due on the Note. This was no more than an obligation on Wingspread's part to prepay the Note in part. It is not indicative of ownership of the reversionary assets.

This case is not unlike *Bicoastal.* 136 B.R. 290. There, the debtor and federal government were parties to several de-fense contracts, and the debtor overfunded several pension plans for its subsidiaries. After the debtor sold those subsidiaries, it attempted to merge the surplus from those overfunded plans into another intentionally underfunded plan. The government objected and sought a determination that it held an "equitable share" in the debtor's reversionary interest in those overfunded plans. The bankruptcy court denied the government's motion, finding that the government's remedies upon termination of the overfunded plans were either a cost reduction against future contracts or a cash refund. This right to a cash refund, the court held, was nothing more than a right to payment under section 101(5) of the Bankruptcy Code. 136 B.R. at 294. Nothing in the record, the court concluded, warranted a finding that the government ought be entitled to either a resulting or constructive trust. *Id.*

Like the government in *Bicoastal,* Kayser–Roth has failed to demonstrate that it maintained any interest in the reversionary assets of the Wingspread Plan. Nor have grounds been demonstrated for the imposition of a constructive trust. The Purchase Agreement provided Kayser–Roth with a contractual right to a cash payment, and nothing more, upon termination of the Wingspread Plan. This right to payment under section 12(b)(xix) of the Purchase Agreement entitles Kayser–Roth to a claim against Wingspread; it did not vest in Kayser–Roth any particular ownership interest in these reversionary assets.

Kayser–Roth's interpretation of the Purchase Agreement and Wingspread Plan, while inventive, is strained and unreasonable. *Seiden,* 959 F.2d at 427. Kayser–Roth has failed to demonstrate that any sensible basis exists for a difference in opinion as to the meaning of the documents. *Hunt,* 889 F.2d at 1277. I simply cannot find any ambiguity. ERISA provides that only the plan's employer is entitled to a return of the plan's reversionary assets. 29 U.S.C. § 1344(d)(1). In the case of the Wingspread Plan, that employer was Wingspread. That Kayser–Roth was the employer of the overfunded K–R Plan is of

no moment. Whatever psychological advantage the Paramount Defendants hoped to engender by coining the phrase "Old Plan Reversionary Assets" to be used consistently when referring to the surplus in the Wingspread Plan does not help those Defendants.

Accordingly, the chapter 7 trustee's motion for summary judgment is granted. The Paramount Defendants' motion for summary judgment is denied. SETTLE ORDER consistent with this decision.