**PENSION TRANSFER CORP., Plaintiff,**

v.

**BENEFICIARIES UNDER THE THIRD AMENDMENT TO FRUEHAUF TRAILER CORPORATION RETIREMENT PLAN NO. 003, Defendants,**

**and**

**Fruehauf Trailer Corporation Retirement Plan, Plan No. 003, Nominal Defendant.**

**No. CIV.A.99–115 JJF.**

United States District Court, D. Delaware.

Jan. 7, 2005.

William H. Sudell, Jr., Esquire, Derek C. Abbott, Esquire, and Gregory T. Donilon, Esquire of Morris, Nichols, Arsht & Tunnell, Wilmington, DE, Of Counsel: James W. Perkins, Esquire, of Greenberg Traurig, LLP, New York, NY, for Plaintiff.

Edward M. McNally, Esquire, and Linda Martin Gilchrist, Esquire, of Morris, James, Hitchens & Williams LLP, Wilmington, DE, Of Counsel: Kevin L. King, Esquire, of King, Krehbiel, Hellmich, Hentz & Borbonus, LLC, St. Louis, MO, for Defendants.

Bayard J. Snyder, Esquire, of Snyder & Associates, P.A., Wilmington, DE, for Nominal Defendant Fruehauf Trailer Corporation Retirement Plan, Plan No. 003.

### OPINION

FARNAN, District Judge.

This is an action brought by Pension Transfer Corporation to declare an amendment to a pension plan a fraudulent transfer pursuant to Section 548 of the Bankruptcy Code and, as such, void in whole or in part. For the reasons discussed, the Court concludes that the amendment to the pension plan constituted a fraudulent transfer.

### BACKGROUND

#### I. Parties

Fruehauf Trailer Corporation ("Fruehauf"), was a public Delaware corporation in the business of designing, manufacturing, and selling truck trailers and related parts, accessories, and services. It operated manufacturing, distributing, sales, and servicing facilities throughout the U.S. (Pl.'s Ex. 6, at 3–6; D.I. 188 at 4–5, ¶ 2.)

Plaintiff Pension Transfer Corporation ("Pension Transfer") is a Delaware corporation having its principal place of business

in Corona Del Mar, California. It was created as a subsidiary of the End of the Road Trust, which succeeded to the assets of Fruehauf's bankruptcy estate under the Chapter 11 plan of reorganization.

Nominal Defendant Fruehauf Trailer Corporation Retirement Plan No. 003 ("the Plan") is a retirement plan qualified under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. Pension Transfer administers the Plan. The Plan is sued as a nominal defendant in its capacity as the stakeholder of the pension plan funds. The Plan's principal place of business is in Corona Del Mar, California.

The Class Defendants are Plan beneficiaries of certain enhanced pension benefits under an amendment to the Plan ("Third Amendment").

## II. Jurisdiction & Venue

The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334 because this proceeding arises in and is related to the chapter 11 cases filed by Fruehauf and its affiliated debtors pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), Case Nos. 96–1563(PJW) through 96–1572(PJW) (the "Bankruptcy Proceeding").

Venue is proper in this district pursuant to 28 U.S.C. § 1409 because this proceeding arises in and relates to bankruptcy cases pending in the Bankruptcy Court. Pension Transfer is an entity resulting from the Fruehauf Bankruptcy Proceeding.

## III. Procedural History

On January 20, 1998, debtor-in-possession Fruehauf filed this Adversary Proceeding, Adv. No. A98–94, in the Bankruptcy Court against the Plan seeking, *inter alia*, a declaration that the Third Amendment to the Plan constitutes a fraudulent transfer pursuant to Section 548 of the Bankruptcy Code and, as such, is void in whole or in part.

On October 5, 1998, Fruehauf filed a motion for both a temporary restraining order and a preliminary injunction to prevent the Plan from distributing certain benefits authorized by the Third Amendment. The Bankruptcy Court denied Fruehauf's motion for a temporary restraining order, but, on or about December 10, 1998, granted a preliminary injunction enjoining the Plan from paying its beneficiaries any increased benefits due under the Third Amendment.

On September 17, 1998, the Bankruptcy Court confirmed Fruehauf's initial Chapter 11 plan of reorganization. On October 27, 1999, the Bankruptcy Court approved Fruehauf's second amended plan of reorganization, pursuant to which Pension Transfer was formed to succeed Fruehauf as the plan sponsor and administrator.

The parties stipulated to the withdrawal of the reference. On March 30, 2000, the Court ordered the reference withdrawn pursuant to 18 U.S.C. § 157(d). (D.I.6.)

On August 11, 2000, the Plan filed and served an Answer to the Complaint, denying Plaintiff's claims and asserting eleven affirmative defenses. (D.I.15.)

On March 30, 2001, Pension Transfer made a Motion To Amend the Complaint to, *inter alia*, name as defendants all pension plan beneficiaries of the Third Amendment, and to simultaneously reclassify the Plan as a nominal defendant. (D.I.19.) The Plan stipulated to the filing of Pension Transfer's motion and on April 3, 2001, the Court granted Pension Transfer's Motion To Amend the Complaint. (D.I.21.)

On April 23, 2001, Plaintiff Pension Transfer filed an Amended Complaint naming all the beneficiaries of the Third Amendment to the Plan as party defendants, and recasting the Plan as a nominal defendant. (D.I.22.)

On May 1, 2002, the Court certified this matter as a mandatory defendant class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. The newly-added defendants were thus designated as "Class Defendants." (D.I.50.)

On August 27, 2002, Class Defendants answered Pension Transfer's Amended Complaint by denying Plaintiff's claims and asserting five affirmative defenses. (D.I.61.)

The Court held trial from March 16, 2004, to March 18, 2004. The parties have submitted their post-trial papers. The following constitutes the Court's findings of fact and conclusions of law.

### FINDINGS OF FACT

1.  Fruehauf began to encounter serious financial difficulties in the 1980s. (D.I. 118 at 5, ¶ 7.) [1]

2.  By the early 1990s, Fruehauf's long term liabilities, including its obligations to provide employee health care and pension benefits, substantially exceeded its operating revenues. (D.I. 118 at 6, ¶ 8).

3.  To address this crisis, beginning in the late 1980s and continuing through the mid–1990s, Fruehauf reduced the size of its operations. It closed a number of plants and branches, initiated several reductions in its work force, and sold corporate assets. (D.I. 118 at 6, ¶ 9–10).

4.  Fruehauf provided its employees with a pension plan ("the Plan") as part of its benefits package.

5.  The Plan is a retirement plan qualified under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq. The Plan covers eligible salaried employees; non-union, hourly employees; and union, hourly employees of Fruehauf. (D.I. 118 at 10, ¶ 51).

6.  In the late 1980s, Fruehauf's Board of Directors ("the Board") adopted a provision in the Plan that froze the calculations of retirement benefits at each participant's 1991 salary level. The Board considered this freeze a temporary measure to reduce the company's required monetary contributions into the Plan. (D.I. 118 at 6, ¶ 12–13.)

7.  After implementing the pension plan freeze in 1991, Fruehauf management discussed the possibility of removing it in the future once the Plan had generated a projected surplus. (D.I. 118 at 6, ¶ 14–15.)

8.  In the early 1990s, Fruehauf management began searching for companies to buy Fruehauf. (D.I. 118 at 7, ¶ 19.)

9.  In 1994, Fruehauf forced salaried personnel to take a short term pay cut to increase Fruehauf's cash flow. Fruehauf also implemented salary freezes. (D.I. 118 at 6, ¶ 11.)

10.  In the mid–1990s, the Plan had a projected surplus. (Pl.'s Ex. 23.)

11.  Beginning in the first part of 1995, management, with input from its actuary, Watson Wyatt Worldwide, considered using the Plan surplus to increase the benefits of Plan beneficiaries. (D.I. 118 at 6–7, ¶ 16–17.)

---

1.  Unless otherwise noted, transcript citations at the end of a numbered paragraph are for    the entire numbered paragraph.

12. In the fall of 1995, Fruehauf management identified and signed contracts with several senior employees the company wanted to retain until its financial difficulties were resolved. The contracts contained change in control provisions paying significant benefits to such employees in the event of a sale of the company. (D.I. 118 at 7, ¶ 22.)

13. In early to mid–1996, to help stabilize its work force, Fruehauf implemented a Key Employee Retention Program ("KERP") to pay bonus compensation to approximately 40 employees in exchange for their written promise to stay with the company until either a sale or merger occurred or until March 31, 1997, whichever occurred first. (Pl.'s Ex. 22.)

14. By mid–1996, Fruehauf's employees were generally aware that Fruehauf was actively trying to sell the company. (D.I. 118 at 7, ¶ 21.)

15. In June 1996, members of the Fruehauf Board did not believe selling Fruehauf as an ongoing concern was a likely outcome because of Fruehauf's negative net worth, its trailing liabilities, and economic conditions in the industry at that time. (Dep. Test. of Worth Frederick at 12:2—13:8; D.I. 166 at A–31:2–8.)

16. In September 1996, Fruehauf had approximately 2,000 employees, 52% of whom were represented by labor unions. (Pl.'s Ex. 5 at 4.)

17. In September 1996, due to continued financial difficulties, Fruehauf did not have enough cash to sustain its operations and meet its obligations. (D.I. 118 at 10, ¶ 29.)

18. In August and September of 1996, Fruehauf's President and CEO, as well as Fruehauf's Executive Vice–President and CFO, resigned. (D.I. 166 at A–38:7–10.)

19. On September 19, 1996, the Board held an emergency meeting with advisors to discuss the severe cash crisis facing the company and the possible filing of a Chapter 11 bankruptcy petition. (D.I. 118 at 8, ¶ 34; D.I. 166 at A–32:21–25, A–33:1–4.)

20. At the September 19, 1996, Board meeting, two of the topics discussed were the Modified Retention Plan and the Third Amendment to the Plan. (Pl.'s Ex. 90; D.I. 166 at A–38:12–23, A–53:10–20.)

21. The Modified Retention Plan called for the distribution of immediate cash payments to 12 of the KERP participants in exchange for their agreement to remain employed with Fruehauf through March 1, 1997. (Pl.'s Ex. 22.)

22. The Board approved the Modified Retention Plan at its September 19, 1996, meeting. (D.I. 166 at A–45:21–22.)

23. The Third Amendment granted salaried, non-union employees two separate pension benefit increases. First, the Cash Balance Benefit provided that each employee who stayed until March 31, 1997, would receive a contribution to his or her pension account equal to 5% of his or her annual salary as of January 1, 1996, plus 8% annual interest on such amount until retirement. (D.I. 118 at 9, ¶ 42.)

24. All salaried Plan participants were eligible for the Cash Balance Benefit, regardless of vesting status. (D.I. 164 at 171:20—172:3.)

25. At the time the Third Amendment was enacted, approximately 130 of the Third Amendment beneficiaries were not vested in the Plan. (D.I. 164 at 8:12–13.)

26. Second, the Third Amendment increased pension benefits by a Pension Thaw, which modified the salary year that was used to calculate pension benefits. The Pension Thaw provided that Fruehauf would use 1996 salaries, rather than 1991 salaries, to calculate pension benefits. (D.I. 118 at 10, ¶ 44.)

27. Only those salaried employees vested in the Plan qualified for the Pension Thaw. (D.I. 118 at 10, ¶ 49.)

28. The Third Amendment affected the pension benefits of approximately 400 Fruehauf employees (D.I. 164 at 21:21–25.)

29. At the time the Board adopted the Third Amendment, Ms. Geraldine Tigner was employed by Fruehauf as its Vice–President of Human Resources and was also one of four members of Fruehauf's Pension Administration Committee. (D.I. 164 at 118:3–4; D.I. 166 at A–40:8–13.)

30. At the time the Board adopted the Third Amendment, Mr. Greg Fehr was employed by Fruehauf as a senior executive in its corporate headquarters and was also a member of the Pension Administration Committee. (D.I. 166 at A–40:11–13.)

31. Ms. Tigner and Mr. Fehr were the only Fruehauf employees to review drafts of the Third Amendment. The Board's Compensation Committee did not review the contents of or approve the Third Amendment prior to the September 19, 1996, Board meeting. (D.I. 164 at 146:3—147:12.)

32. Both Ms. Tigner and Mr. Fehr were participants in the KERP as modified by the Modified Retention Plan. (D.I. 166 at A–38:20–25.)

33. Ms. Tigner's pension benefits increased approximately 200% as a result of the Third Amendment. (Pl.'s Ex. 96, 97.)

34. Mr. Fehr's pension benefits increased approximately 470% as a result of the Third Amendment. (Pl.'s Ex. 96, 97.)

35. ERISA counsel at Jones Day Reavis & Pogue ("Jones Day") drafted the Third Amendment documents. (D.I. 164 at 126: 12–15.)

36. The Board of Directors approved the Third Amendment at the September 19, 1996, Board meeting after Richard Nevins, the Acting Chairman of the Board, characterized the Third Amendment as an "administrative formality" that would not result in any increased cash outlay. (D.I. 166 at A–44:15–23; Dep. Test. of Frederick Worth at 25:4–24.)

37. Members of the Board never received a copy of the Third Amendment. (D.I. 166 at A–43:21—A44:5; Dep. Test. of Frederick Worth at 44:9–15.)

38. The Third Amendment was never presented to the Board as a means to retain employees during the sale of the company or its assets. (D.I. 166 at A–43 at 6; Dep. Test. of Worth Frederick at 24:22–25.)

39. On October 7, 1996, Fruehauf filed in the United States Bankruptcy Court for the District of Delaware a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. (D.I. 118 at 9, ¶ 40; Pl.'s Ex. 22.)

40. As of October 7, 1996, Fruehauf had approximately 20,000 creditors with over $12 billion in claims and liabilities. (D.I. 118 at 8, ¶ 30).

41. In November 1996, Fruehauf management estimated that the Third Amendment would increase Plan liabilities by approximately $2.4 million. (Pl.'s Ex. 51.)

42. As part of the bankruptcy proceeding, Fruehauf was liquidated pursuant to various dispositions of its assets including (a) the sale of European assets in June 1996; (b) the sale of the Waverly, Ohio plant in August 1996; (c) the sale of Delphos Axel to Holland Hitch on February 1997; (d) the sale of the Fruehauf name, two trailer manufacturing plants, and 31 of 35 distribution centers to Wabash in April 1997; and (e) the transfer of remaining Fruehauf assets to a liquidating trust for the benefit of creditors. (Pl.'s Ex. 5 at 10–12; Pl.'s Ex. 86 at ¶ 11(f).)

43. Wabash was the sole bidder at a March 17, 1997, auction of Fruehauf's domestic trailer manufacturing and distribution businesses. (Pl.'s Ex. 5 at 11.)

44. Wabash paid approximately $55 million for the assets it purchased. (D.I. 151 at 6:24.)

45. Wabash did not purchase all of the remaining Fruehauf assets. It did not purchase Fruehauf's branches in Omaha and Billings or Fruehauf's operations in Mexico. (D.I. 151 at 15:6–15.)

46. Wabash valued the availability of skilled employees to work in and manage the manufacturing and distribution assets. (D.I. 151 at 6:2–19.)

47. Mark R. Holden, Wabash's Chief Financial Officer, did not testify with certainty that Wabash would not have purchased the Fruehauf assets if they were not ongoing concerns. (D.I. 151 at 6:25—7:6.)

48. The Asset Purchase Agreement entered into between Fruehauf and Wabash contained no provision for purchasing or retaining Fruehauf employees. (D.I. 151 at 12:25—13:7.)

49. On the date of the sale to Wabash, Fruehauf terminated its employees and Wabash subsequently rehired those employees it wanted. (TT 9:10–17; TT 13:8–12.)

50. Wabash did not hire any of the salaried Fruehauf employees from Fruehauf's corporate headquarters in Indianapolis, Indiana, most of whom were beneficiaries of the KERP and the Third Amendment. (D.I. 164 at 166:16–20; D.I. 151 at 31:23–25.)

51. Wabash hired approximately 475 of Fruehauf's union employees, who were not beneficiaries of the Third Amendment. (D.I. 151 at 12:21–24.)

52. Defendants offered no evidence that Wabash paid more money because the assets it purchased were ongoing operations. (D.I. 151 at 11:3–7, 34:9—35:1.)

53. Wabash did not allocate any of its purchase price to reflect the value of the Fruehauf employees that stayed with Fruehauf after the bankruptcy filing. (D.I. 151 at 17:11–19, 34:9—35:1.)

54. Key employee retention plans typically cost a company between 0.4 and 0.5% of the company's revenue. (D.I. 164 at 49:22–24.)

55. Without the Third Amendment, Fruehauf's original KERP, as modified by the Modified Retention Plan, cost the company 0.3% of its revenue, or $1.3 million, over an 8–month period. (D.I. 164 at 52:20—53:1.)

56. Fruehauf's original KERP, as modified by the Modified Retention Plan, granted above-average benefits when compared with other comparable KERPs. (D.I. 164 at 53:7–10.)

57. By adding the $2.4 million cost of the Third Amendment to the $1.3 million cost of Fruehauf's KERP, the total benefits constituted 0.88% of Fruehauf's revenue. Pension Transfer's expert witness from KPMG, Irving Becker, testified that this amount exceeded the amount that a reasonable company in Fruehauf's position would spend to retain employees. (D.I. 164 at 54:6–17, 55:19–21.)

58. Companies typically make KERP payments periodically over a retention period of 12–18 months and tie final payment to the emergence from bankruptcy or the sale of assets. (D.I. 164 at 50:10–17.)

59. The Third Amendment provided that benefits be paid at the end of 6 months and not at the occurrence of any event. (D.I. 164 at 55:7–12; 115:3–5.)

60. In her testimony, Ms. Tigner, the Director of Human Resources at the time the Third Amendment was adopted, was not able to offer factual support for the conclusion that the Third Amendment was effective in retaining Fruehauf employees. (D.I. 164 at 140:2–10.)

## CONCLUSIONS OF LAW

### I. Fraudulent Transfer

■ Section 548 of the Bankruptcy Code addresses the law of fraudulent transfers. Such a transfer may be caused by either actual fraud or constructive fraud. Pension Transfer alleges only constructive fraud. In relevant part, the fraudulent transfer provisions of the Bankruptcy Code provide:

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily-...

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation.

11 U.S.C. § 548 (1998). Thus, to avoid a transfer under Section 548(a)(2), a trustee must establish that "(1) the [d]ebtor had an interest in the property; (2) the interest was transferred within one year of the filing of the bankruptcy petition; (3) the [d]ebtor was insolvent at the time of the transfer or became insolvent as a result thereof; and (4) the [d]ebtor received less than a reasonably equivalent value in exchange for such transfer." *In re Gutpelet,* 137 F.3d 748, 751 (3d Cir.1998) (citing *BFP v. Resolution Trust Corp.,* 511 U.S. 531,

535, 114 S.Ct. 1757, *reh'g denied,* 512 U.S. 1247, 114 S.Ct. 2771, 129 L.Ed.2d 884 (1994)).

■ The trustee has the burden of establishing each of the elements of a fraudulent transfer claim. *See In re R.M.L., Inc.,* 92 F.3d 139, 144 (3d Cir.1996). *See also Collier on Bankruptcy* ¶ 548.10 (15th Ed.1997). "This burden of proof never shifts." *Id.*

#### A. *Interest in Property*

■ The parties disagree as to whether the property right at issue is the contingent interest in the Plan's surplus, or the Plan's surplus itself. The Class Defendants contend that Pension Transfer failed to demonstrate that a surplus existed at the time of the transfer, and that, therefore, there is no property interest at issue. Pension Transfer contends that the relevant inquiry is the value of the contingent interest in the Plan's surplus at the time of the transfer.

■ Section 541 of the Bankruptcy Code defines property of the estate as "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. § 541. As of January 1, 1996, the actuary to the Plan projected a surplus of approximately $10.6 million in the Plan. (Pl.'s Ex. 23.) In November 1996, Fruehauf estimated the cost of the Third Amendment to be approximately $2.4 million. (D.I. 118 at 6, ¶ 11.) Even assuming there was no surplus in the Plan at the time of the transfer in September 1996, under ERISA and section 9.4 of the Plan, Fruehauf, as the Plan's sponsor, was entitled to any surplus upon termination of the Plan. (Pl.'s Ex. 2 at 3.) Future interests are property interests under the Bankruptcy Code. *See In re Wingspread Corp.,* 155 B.R. 658, 664 (Bankr.S.D.N.Y. 1993). Thus, surplus in the Plan was a property interest of Fruehauf. *See id.;*

*Creasy v. Coleman Furniture Corp.*, 763 F.2d 656, 662 (4th Cir.1985). As such, the Court finds that Fruehauf's interest in the Plan surplus falls within the definitional reach of section 541(a) of the Bankruptcy Code and is considered property of Fruehauf's estate. *See In re Wingspread Corp.*, 155 B.R. at 664; *Creasy*, 763 F.2d at 662.

For these reasons, the Court concludes that Fruehauf had an interest in property within the meaning of Section 548(a) of the Bankruptcy Code.

### B. *Transferred within One Year*

#### 1. *Transfer*

▮ The Class Defendants contend that the transfer of Fruehauf's interest in the Plan surplus did not occur until March 31, 1997, when the Class Defendants earned the right to the Third Amendment benefits. Pension Transfer contends that, though the interest was contingent, the adoption of the Third Amendment conveyed a beneficial interest in Fruehauf's property as of the date of the adoption. Pension Transfer further contends that, under ERISA, a liability accrues upon awarding the benefit, whether or not the Class Defendants then earned them.

Section 101(54) of the Bankruptcy Code defines "transfer" to mean "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property...." 11 U.S.C. § 101(54). Section 548(d)(1) provides that "if such transfer is not ... perfected before the commencement of the case, such transfer is made immediately before the date of the filing of the petition."

ERISA was designed to promote the interests of employees and their beneficiaries in employee benefit plans. *Nazay v. Miller*, 949 F.2d 1323, 1329 (3d Cir.1991).

Pursuant to ERISA, an accrued benefit may not be retroactively decreased through the purported exercise of an administrator's discretion. *See* 29 U.S.C. § 1054(g)(1); *DiCioccio v. Duquesne Light Co.*, 911 F.Supp. 880, 897 (W.D.Pa.1995). The Court finds that in adopting the Third Amendment, Fruehauf made an irrevocable election to allocate a portion of the Plan's surplus to the Cash Balance Benefit and to the Pension Thaw. Thus, the Court concludes that the irrevocable election to increase pension benefits under the Third Amendment constituted a "transfer" within the meaning of Section 548(a).

#### 2. *Within One Year*

A transfer is "made" when it is perfected such that a subsequent bona fide purchaser under state law cannot acquire an interest in the property transferred. 11 U.S.C. § 548(d)(1). The parties do not dispute that the transfer was made within one year of Fruehauf's filing its bankruptcy petition on October 7, 1996.

### C. *Insolvency*

▮ In determining solvency for the purposes of Section 548, courts apply a balance sheet evaluation. *See Mellon Bank, N.A. v. Metro Comm., Inc.*, 945 F.2d 635, 650 (3d Cir.1991). The parties do not dispute that Fruehauf was insolvent at the time the transfer was made.

### D. *Less Than a Reasonably Equivalent Value*

▮ Determining the existence of "reasonably equivalent value" requires two separate and distinct inquiries. *In re R.M.L. Inc.*, 92 F.3d 139, 149 (3d Cir.1996). The Court must determine, first, "whether the debtor received any value at all," and, if so, "whether the value was 'reasonably equivalent' to what the debtor gave up..." *Id.*

### 1. Value

■ Pension Transfer contends that the Third Amendment had no value because (1) it was the product of fraud, (2) it violated ERISA, (3) it discriminated in favor of highly compensated individuals, and (4) future performance cannot constitute value. In response, Defendants contend that Fruehauf received at least three substantial benefits from the Third Amendment: (1) the retention of its employees, (2) the value of the employee services performed before March 31, 1997, and (3) the $55 million it received from Wabash for its operating, manufacturing, and distribution business.

■ As the Supreme Court has recognized, "[o]f the three critical terms 'reasonably equivalent value', only the last [value] is defined." *BFP v. Resolution Trust Corp.,* 511 U.S. 531, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994). Section 548 defines "value" as "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor . . . ." 11 U.S.C. § 548(d)(2)(a). Value includes "any benefit" to the debtor, "direct or indirect." *In re R.M.L., Inc.,* 92 F.3d at 150; *Mellon Bank,* 945 F.2d at 646. "[T]he mere 'opportunity' to receive an economic benefit in the future constitutes 'value' under the Code." *In re R.M.L., Inc.,* 92 F.3d at 148.

The Court finds that the debtor, Fruehauf, received value. First, Pension Transfer has not sought to establish the facts necessary to prove the transaction was the product of actual fraud; Pension Transfer has asserted a claim of constructive fraud only.

Second, the Court finds that Pension Transfer's allegation that the Third Amendment violates ERISA and thus has no value lacks factual foundation. ERISA,

in relevant part, addresses the duties of a fiduciary to plan participants. Defendants, however, were not fiduciaries to the Plan. Rather, Fruehauf's Board of Directors were the Plan's fiduciaries. The Court finds that Pension Transfer has not sought to establish the facts necessary to prove that Fruehauf's Board of Directors, in approving the Third Amendment, violated its fiduciary duties to Fruehauf under ERISA. Thus, the Court cannot conclude that the Third Amendment violated ERISA.

Third, the Court finds that Pension Transfer's contention that the Third Amendment discriminated in favor of highly compensated individuals is irrelevant to the question of whether the transaction conferred commercial value upon Fruehauf.

Fourth, and finally, the Court finds that future services, such as those likely received from an employee retention plan, constitute value. *See In re R.M.L. Inc.,* 92 F.3d at 148. Because the Third Amendment may have been effective in retaining the services of at least one Fruehauf employee, the Court concludes that the Third Amendment had value to the debtor, Fruehauf.

### 2. Reasonably Equivalent Value

■ Defendants contend that the Third Amendment provided the debtor with value reasonably equivalent to its cost. Specifically, Defendants contend that the Third Amendment required employees to remain with the Company until March 31, 1997, thus benefiting Fruehauf with the employees' individual and collective experience, skill, and work product. Defendants further contend that the employee retention allowed Fruehauf to continue operating as an ongoing concern, which enabled it to maintain its obligations

to customers and ultimately sell the company.

In response, Pension Transfer contends, first, that Fruehauf did not receive fair market value for the Third Amendment. Pension Transfer argues that (1) the cost of the Third Amendment, $2.4 million, far exceeded the amount necessary to retain employees; (2) the Fruehauf Board and Management never discussed a need to retain salaried employees; and (3) the Third Amendment required only a six month stay and was not tied to a corporate restructuring event, such as an asset sale or emergence from bankruptcy. Second, Pension Transfer contends that the Third Amendment was not effected at arm's length. Third, Pension Transfer contends that the transfer was not made in good faith.

In assessing reasonable equivalence, "[t]he touchstone is whether the transaction conferred realizable commercial value on the debtor reasonably equivalent to the realizable commercial value of the assets transferred." *Mellon Bank*, 945 F.2d at 647. The Third Circuit applies a totality of the circumstances test when assessing reasonable equivalence. *In re R.M.L., Inc.*, 92 F.3d at 148–49, 153.

While reasonable minds could differ as to how much value Fruehauf received in exchange for the Third Amendment, in view of the evidence and the burden of proof, the Court concludes that Fruehauf received considerably less than the cost of the Third Amendment.

Pension Trust has the burden of proving that Fruehauf received less than reasonably equivalent value in exchange for the obligations it incurred as a result of implementing the Third Amendment. Pension Transfer's expert witness from KPMG, Irving Becker, testified that key employee retention plans typically cost a company between 0.4% and 0.5% of its revenue.

(D.I. 164 at 49:22–24.) Further, Mr. Becker testified that the cost of Fruehauf's KERP and Third Amendment constituted 0.88% of Fruehauf's revenue, twice the norm. (D.I. 151 at 55:19–21.) Thus, Pension Transfer brought forth evidence establishing that the cost of the Third Amendment to Fruehauf exceeded its benefits in terms of anticipated employee retention.

Defendants, who have no burden of proof, answered that Fruehauf's strategy was to ensure Fruehauf survived as an ongoing concern and that this was necessary for the ultimate sale to Wabash. Wabash certainly valued the availability of skilled employees to work in and manage the manufacturing and distribution assets it purchased. However, Mark R. Holden, Wabash's Chief Financial Officer, did not testify with certainty that Wabash would not have purchased the Fruehauf assets if they were not ongoing concerns. Further, in her testimony, Ms. Tigner, the Director of Human Resources at the time the Third Amendment was adopted, was not able to offer factual support for the conclusion that the Third Amendment had the effect of retaining Fruehauf employees.

Other circumstances informing the Court's decision are the manner in which the Third Amendment was presented to Fruehauf's Board of Directors for approval, and the fact that the Third Amendment's sponsors stood to benefit significantly from its implementation. The Third Amendment was never presented to the Board as a means to retain employees during the sale of the company or its assets. On the contrary, the Board approved the Third Amendment only after being told it was an administrative formality that would not result in any increased cash outlay for the company. Further, the Board's Compensation Committee did not

review the contents of or approve the Third Amendment prior to the September 19, 1996, Board meeting, and the Board members never received a copy of the Third Amendment.

Ms. Tigner and Mr. Fehr, the sponsors of the Third Amendment, benefited considerably from its implementation. Ms. Tigner's pension benefits increased approximately 200% and Mr. Fehr's benefits increased approximately 470% as a result of the Third Amendment. Even overlooking Ms. Tigner's interest in the matter, the Court did not find her testimony convincing with regard to the Third Amendment's purpose and effectiveness.

For these reasons, the Court concludes that Pension Trust has proved by a preponderance of the evidence that Fruehauf received less than a reasonably equivalent value in exchange for the Third Amendment.

## CONCLUSION

For the reasons discussed, the Court concludes that the Third Amendment to the Plan constituted a fraudulent transfer pursuant to Section 548 of the Bankruptcy Code.

### FINAL JUDGMENT IN A CIVIL CASE

At Wilmington, this 7th day of January 2005, for the reasons set forth in the Opinion and Order issued this date;

IT IS HEREBY ORDERED that judgment is entered in favor of Plaintiff Pension Transfer Corporation, and against Class Defendants Beneficiaries Under The Third Amendment To Fruehauf Trailer Corporation Retirement Plan No. 003.